**DOMINICA MINING COMPANY, Ltd.,**
**Plaintiff,**

v.

**PORT EVERGLADES TOWING COM-**
**PANY, Ltd., a domestic corpora-**
**tion, Defendant.**
**Civ. No. 67–433.**

United States District Court,
S. D. Florida.
Nov. 10, 1969.

Raymond T. Greene, Miami, Fla., for plaintiff.

William C. Norwood, Miami, Fla., for defendant.

### FINDINGS OF FACT
### AND
### CONCLUSIONS OF LAW

CHOATE, Senior District Judge.

This cause came on for trial before the Court sitting without jury upon a Complaint filed under Rule 9(h) of the Federal Rules of Civil Procedure for money

damages as the result of breach of charter and upon a Counterclaim for monies owed as the result of demurrage arising under the Charter. The Court, having considered the evidence, the exhibits filed herein and the testimony of the witnesses, makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. On or about the 7th day of May 1966, Port Everglades Towing Company, Ltd., bareboat charterer of the barge B–12 and the tug "Wesley W", entered into a sub-charter with Dominica Mining Company, Ltd. by the terms of which Port Everglades Towing Company, Ltd. agreed to provide the tug "Wesley W" and the barge B–12 to carry a cargo of pumice from the Island of Dominica to the Island of St. Martin for the sum of $6,500. The pumice which was to be loaded aboard the barge weighed approximately one ton to a cubic yard.

2. The Charter Party provided that the barge B–12 had a mean draft of 10 feet 9 inches and could carry approximately 1600 tons of cargo. Although not noted in the Charter Party, the tug "Wesley W" had a draft of 9 feet 6 inches. The Charter Party also provided that barge was to be loaded and discharged free of risk and expense to the vessel or her owners.

3. The Charter Party further provided that the Charterer Dominica Mining Company have a total of 48 hours free time for loading and discharging the cargo. The Charter Party provided that demurrage was to run at the rate of $800 per day or pro rata for any part of a day, "payable day by day."

4. On the 14th of June, 1966, at 1500 hours, the barge was positioned for loading at plaintiff's dock, Roseau, Domini-ca. Thereafter, employees of plaintiff proceeded to load a cargo of crushed pumice aboard the barge. The tug was not in attendance.[1] A winch was to be used to move the barge forwards and backwards so that the pumice could be evenly distributed. By that night, however, an excessive amount of pumice was placed on the after third of the barge by plaintiff, causing her stern to sink, with the stern decks awash and the bottom in the mud.

5. This overloading of the stern of the barge required redistribution of the cargo. Because of the delays required to redistribute the cargo, loading was not completed until 2200 hours on June 16, 1966.[2]

6. Approximately 1500 tons of pumice were ultimately put on the barge by plaintiff. However, the barge could safely hold only about 1200 tons and 300 tons of pumice were jettisoned prior to departure.

7. On the morning of June 17, 1966, the tug and barge departed for St. Martin with about 1200 tons of cargo. The barge was listing slightly to starboard, with a 12 foot draft on the starboard side and 11 foot draft on the port side.[3]

8. The barge arrived at St. Martin on June 18, 1966 at 1800 hours. There is an inner harbor and an outer harbor at St. Martin. In order to enter the inner harbor, it was necessary to cross a sand bar with a maximum clearance of about 9½ feet. The outer harbor at St. Martin had a pier or discharge berth available with water alongside over 30 feet deep. The pier or discharge berth in the inner harbor had water at its outer berth of a depth of 8 feet.

9. Because of the draft of the barge, the inner harbor could not be entered. Although the consignee had been advised

---

1. There is a direct conflict in testimony as to whether the captain of the tug was requested to stay in attendance and refused, and if so, whether his refusal was justified because of rough seas.

2. The tug was in attendance on the 15th and 16th of June.

3. Although plaintiff maintains that the barge was evenly loaded and drawing about 9 feet, the more persuasive evidence is as described. It was the tug captain's testimony that the barge was even at the dock, but that she listed because of load distribution upon pulling away from the dock.

of the arrival of the barge, no representative consignee was on the island to receive the cargo nor had any preparations been made to have loading facilities and workmen available to commence discharge.

10. On the afternoon of June 20, 1966, the consignee's representative arrived on the island and began at that time to make preparations for discharge. Because of the draft of the barge and the tug it was impossible to position the barge at any of the docks in the inner harbor where efficient mechanical means could be used for discharging the cargo.

11. On the afternoon of June 22, 1966 the consignee arranged to have a crew of workmen and a small crane alongside the barge at the dock in the outer harbor. The cargo was manually loaded into a bucket of approximately one cubic yard capacity, taken onto the dock and discharged into a truck. Plaintiff, or its agents, had not anticipated the necessity of this procedure and it proved to be extremely slow and inefficient.

12. Before June 26, 1966, and before the vessels had arrived at St. Martin, the defendant, through its agent, had demanded demurrage money from Plaintiff because of the loading delays at Dominica. Without conceding liability, plaintiff deposited $2,500 in escrow for the account of defendant with their bankers at Roseau, Dominica.

13. After approximately three and ½ days of unloading at the outer harbor at St. Martin only 300 to 400 yards of pumice had been discharged. At this time, the barge was drawing approximately 8 feet. Water adjacent to the dock in the inner harbor was 8 feet deep or less. The tug had previously explored the inner harbor and had hit bottom several times. Plaintiff, through its consignee or otherwise, never requested that the tug attempt to position the barge at the inner dock after it had been partially unloaded. In any event, the tug captain was not obligated to risk his vessel in an attempt to position the barge in the inner harbor.

14. Representatives of defendant realized that demurrage was accruing at the rate of $800 per day and that only about one-fourth of the cargo had been discharged in a period of 3 and ½ days. They were also concerned about the financial stability of the consignee (which later proved to be merited) and ultimately, on advice of counsel, instructed the tug captain to take the barge to St. Croix where the cargo could be disposed of. Without notifying plaintiff, the tug and barge departed for St. Croix on June 26th. At St. Croix, defendant proceeded in rem against the remaining cargo and ultimately had to give it away.[4] Defendant incurred expense at St. Croix of $950 wharfage, $600 stowage, and $476.75 unloading charges.

## CLAIMS FOR RELIEF

1. Defendant asserts that it is entitled to demurrage for a period of 9 days, 16 hours, and 50 minutes. This is computed on an actual loading and discharging time of 11 days, 16 hours and 50 minutes (including 2 days to discharge the cargo at St. Croix) allowing 2 lay days as provided by the charter, the net claim being $7,761.13. Defendant additionally claims as damages expenses incurred at St. Croix of $950 wharfage, $600 stowage, and $476.75 unloading. The total amount claimed is $9,787.88.

2. Plaintiff claims the following: 1) $1,800 for 300 tons of cargo jettisoned at Dominica (computed at $6.00 per ton laden on the barge); 2) additional costs and expenses incurred during loading at Dominica of $1,983.70; 3) the value (sales price) of the cargo discharged at St. Martin (400 tons at $6.00 or $2,400); 4) the value of the 800 tons of cargo taken to St. Croix ($4,800 at $6.00 per ton); 5) return of the pre-paid freight ($6,500); 6) release of the $2,500 now

4. Had there been a market for pumice generally, this pumice was a special mixture for incorporation into a hotel at St. Martin.

held in escrow. Plaintiff claims a total sum of $17,483.70.

## CONCLUSIONS OF LAW

### LOADING AT DOMINICA

■ 1. It is well settled that it is the charterer's responsibility to see that the ship is loaded within the time stated, no matter what the cause for delay might be, subject to the following exceptions: 1) specific exonerating clauses in the charter party; 2) delay attributable to the fault of the shipowner or his agents; and 3) delay resulting from a *vis major*. Pennsylvania R.R. v. Moore-McCormack Lines, 370 F.2d 430, 432 (2 Cir. 1966) and authorities cited. In the present case it is the plaintiff's contention that the delay in loading was the fault of the shipowner in that the tug captain should have but failed to actively assist in the loading operation. Plaintiff contends that the tug and the barge were chartered "as a unit" and that the tug should have assisted in moving the barge forward and backward in order to achieve even load distribution.[5] Plaintiff's position is refuted by the terms of the charter party.

■ 2. Clause 5 of the Charter Party (printed) provides that shore operations are the charterer's responsibility, "vessel only heaving the cargo onboard." Typewritten provisions of the document are more specific:[6] "Charterers load and discharge *free of risk and expense* to vessel. Owners *supplying* Deck Barge B–12 * * *." By these provisions it is clear that the defendant had no legal duty regarding the loading operation beyond providing a vessel capable of accepting the cargo. The inexperience of the plaintiff in such matters was conceded, but the court should not elevate what might be a moral obligation to a legal one where, by the contract of the parties, it is clear where the responsibility lies.

3. It follows from the foregoing that plaintiff cannot recover its "unusual" expenses allegedly incurred as a result of the failure of the tug to assist. It further follows that defendant is entitled to demurrage for the delay at Dominica in excess of the lay days provided for in the Charter Party. The agreement provides for a total lay time (loading and discharging) of 48 hours and for demurrage at the rate of $800 per day "or pro rata for any part of a day. * * *" The total time spent in Dominica was 2 days 7 hours and thus defendant is entitled to 7 hours demurrage for the delay at Dominica.

■ 4. The Charter Party stipulates that Barge B–12 could carry "about 1600 tons of deadweight cargo." Depending on the circumstances of the case, statements of speed and capacity in a Charter Party may be considered warranties. "What is important is whether the statement was positively and unequivocally made as a statement of fact and whether the natural tendency of its making was to induce the chartering of the ship." Romano v. West India Fruit & Steamship Co., 151 F.2d 727, 731 (5 Cir. 1945). Of course, it is also generally true that a "statement as to the vessel's deadweight capacity does not mean that she will be able to carry that number of tons of any particular cargo. This is true although the parties may have a particular cargo in contemplation." Poor, Charter Parties, p. 8 (5 Ed.). The reasoning behind this notion, it may be presumed, is the frequent discrepancy between a cargo's deadweight and its cubic displacement.

■ 5. The statement of the barge's capacity on the present case although deadweight, should be considered a warranty. First, the defendant has accept-

---

5. The tug captain did advise the charterer that the barge should be shifted so as to achieve even distribution.

6. Of course, a typewritten provision should be accorded more weight. Cia. Estrella Blanca, Ltda. v. S.S. Nitric, 247 F.Supp. 161 (D.Or.1965), aff'd 368 F.2d 575 (9 Cir. 1966).

ed this premise in argument and only disputes plaintiff's proof of damages. Second, there was no evidence to indicate that the barge's cubic capacity, as respects to pumice, was different from her deadweight capacity.[7]

6. The vessel departed with 1200 tons of pumice; 300 tons were jettisoned. Plaintiff would therefore be entitled to recover its lost profits, if any, on the 100 tons that were merely not delivered and its total loss on the 300 tons that were dumped overboard. In this regard, defendant disputes the adequacy of plaintiff's proof of damages.

7. It is true that plaintiff could not establish a cost figure from which net profit could be determined. It appears that plaintiff was to receive the equivalent of $6.00 per ton delivered, or $9,600 for 1600 tons. Having paid $6,500 freight, plaintiff's net return for 1600 tons delivered without regard to the actual cost of the pumice, was to be $3,100, or $1.94 per ton. Having failed to establish the cost of the pumice,[8] there is simply no basis upon which an award of lost profits can be premised.

8. While the principal cause of the delay at Dominica was a result of uneven loading, it is also true that the 300 tons of cargo that were jettisoned were placed on the barge in reliance upon her expected capacity of 1600 tons. Plaintiff can recover its loss of 300 tons at $6.00 per ton, or $1,800.[9]

### UNLOADING AT ST. MARTIN

9. Plaintiff's claim for the sales price of the 400 tons of cargo actually discharged at St. Martin is totally unfounded. Plaintiff was never paid by its purchaser, the consignee, but there is no basis in fact or law for placing this loss on defendant.

10. Defendant can recover demurrage for the time spent unloading at St. Martin. The inner harbor was inaccessible through no fault of the defendant. Moreover, the Charter Party designates the destination merely as "the island of St. Martin." Defendant therefore satisfied its contractual obligation by tendering the cargo at the outer pier [10] which was the better facility at St. Martin. Part of the delay was attributable to the failure of plaintiff's agents to meet the cargo upon arrival. Eight days were spent at St. Martin and defendant is thus entitled to demurrage in the sum of $6,400.

11. Defendant was not obligated to risk its tug in an attempt to place the barge at the dock in the inner harbor after she was partially unloaded. As stated, defendant had fulfilled its contractual obligation by tendering the cargo at the outer pier. Alternatively, the vessels reached their destination "or so near thereto as [they] may safely get," in accordance with the provisions of the Charter Party.

12. With demurrage accruing in relatively large amounts, defendant was clearly justified in ceasing unloading operations and exercising its contractual lien on the cargo. Having done so, however, defendant cannot recover additional demurrage for those days required for defendant itself to unload the cargo in exercise of the lien. Nor may defendant recover its expenses incident thereto. Having elected to terminate the contract and exercise its lien against

---

7. Following the stipulated lump sum freight, the Charter Party contains the typewritten phrase, "so much as she may load up to her capacity." Defendant has not contended that it was the parties' understanding that this phrase meant so much pumice as the vessel could hold up to, but not exceeding, her rated deadweight tonnage.

8. Plaintiff's manager conceded that this shipment was its first, and was negotiated primarily to establish a market for the product. His testimony indicates that the shipment was to be made at a loss.

9. Plaintiff cannot be faulted for jettisoning the cargo. The expense of transferring the cargo to shore, in light of accruing demurrage, was prohibitive.

10. It should be noted also that the Charter Party designates the mean draft of the barge, when loaded, as 10½ feet.

the cargo defendant is relegated to the proceeds of the lien, whatever they were, to defray the expenses incident thereto.

13. Since defendant was entitled to exercise its lien for demurrage, it follows that plaintiff cannot recover the value of the cargo thus liened. Nor is plaintiff entitled to return of the prepaid freight.

14. Since the lien was unavailing, the amount of demurrage owed is not reduced. Plaintiff is entitled to $1,800 on its claim. Defendant is entitled to demurrage of 8 days, 7 hours on its counterclaim, or $6,633.21. Defendant may recover from plaintiff the net sum of $4,833.31. Judgment may be partially satisfied by release by plaintiff to defendant of the funds now held in escrow. Defendant shall submit a judgment in accordance herewith within ten (10) days from the entry of this order.