## Richmond

C. Lynch Christian, Jr. v. James L. Bullock, Et Al.

June 10, 1974.

Record No. 730553.

Present, Snead, C.J., I'Anson, Carrico, Harrison, Cochran and Poff, JJ.

*Morton H. Clark (Vandeventer, Black, Meredith & Martin,* on brief), for plaintiff in error.

*Joseph W. Richmond, Jr. (Joseph W. Richmond; Richmond & Fishburne,* on brief), for defendants in error.

Poff, J., delivered the opinion of the court.

James L. Bullock and Elizabeth J. Bullock (Bullock) filed a motion for judgment against James L. Taylor and C. Lynch Christian, Jr., alleging that Christian had chartered their yacht KATRINA and employed Taylor as captain, that as the proximate result of Taylor's negligence the vessel was stranded and lost as she attempted to enter the harbor at Great Stirrup

Cay in the Bahama Islands, and that Christian as employer and Taylor as his employee were jointly and severally liable for damages in the sum of $60,000. Christian filed an answer and counterclaim denying that Taylor was his employee, asserting that Taylor was Bullock's employee, and claiming damages resulting from Taylor's negligence in the sum of $2,500 for the loss of personal effects, pro rata rebate of charter fee, and certain personal expenses incurred.

Taylor filed no responsive pleadings, and a default judgment in the sum of $60,000 was entered for Bullock against him.

Upon consideration of the pleadings, depositions, and exhibits, the trial court entered final judgment on March 12, 1973 sustaining Bullock's motion for summary judgment against Christian, fixing damages in the sum of $55,932, and denying Christian's motion for summary judgment on his counterclaim. The trial court ruled that the two documents introduced as exhibits, *viz.*, the Charter-Party [1] (Charter) and the Yacht Employment Agreement (Agreement), "are clear and unambiguous and constitute a bare boat charter" ; that Taylor "was the agent and employee of defendant Christian at the time of the loss"; and that "the parol evidence rule prohibits the admission of extrinsic evidence to vary, modify or contradict the terms" of the Charter or the Agreement. To each ruling, Christian assigns error.

In determining whether Christian is liable to Bullock or Bullock is liable to Christian, the dispositive question is whether Taylor, whose negligence and liability are established by the default judgment, was Christian's employee or Bullock's employee. Since we hold that the trial court erred in finding that the documents were unambiguous and in ruling that parol evidence was inadmissible, we leave the dispositive question to be decided upon remand.

■ In reaching our holding, we do not look to the excerpts of depositions printed in the Appendix [2] but only to the four corners of the two documents involved. The first document, a printed

---

[1] "The term 'charter party,' often shortened to 'charter,' designates the document in which are set forth the arrangements and contractual engagements entered into when one person (the 'charterer') takes over the use of the whole [or part] of a ship belonging to another (the 'owner')." G. Gilmore & C. Black, The Law of Admiralty, 170 (1957).

[2] Christian failed to comply with the time limitation fixed by Rule 5:36 (a). In accord with the provisions of Rule 5:38, the cost of printing the excerpts of depositions will be imposed upon Christian.

form entitled "Charter", identifies Christian as CHARTERER and Bullock as OWNER of the vessel. In the blank provided for the signature of OWNER was the signature "James L. Taylor", apparently affixed "March 18, 1971". Christian's signature was apparently affixed "March 20, 1971". The one week charter term was set to begin March 20, 1971.

The following clauses in the Charter document are pertinent to the ambiguity we perceive in construing the two documents together: [3]

"4. Charterer agrees to pay the Owner the sum of *$1200.00 and $40.00 FSST* as charter hire in the following manner:

"*All* upon the signing of this Charter;

*Charter fee of $1200.00 includes services of crew quoted on attached agreement. $504.00 to be paid on boarding for all expenses except liquor and soft drinks.*"

"5. Charterer agrees to man the yacht with a competent captain having such licenses as may be required by law, and with competent crew, as required. The Charterer shall decide the general course of the voyage and the ports of call within the following limits: *Florida and the Bahamas;* but the Captain shall be responsible for the safe navigation of the vessel and the Charterer shall abide by his judgment as to sailing, weather, anchorages, and other pertinent matters."

. . . .

"9. Charterer agrees that the yacht shall be employed exclusively as a pleasure vessel for the sole and lawful use of himself, his family, guests and servants during the term of the Charter, and Charterer agrees not to transport freight or carry passengers for pay, nor engage in any trade, . . ."

The following printed Charter clause was deleted by typewritten x's:

"6. Charterer agrees to pay all running expenses during the term of the Charter including, but not limited to, wages and food of master and crew, fuel and water, deck, engine room, and other consumable stores, pilotage, port charges, and provisions and supplies for Charterer and party."

---

[3] Typed language is indicated by underscored italics.

Attached to the Charter was the second document, a printed form entitled "Yacht Employment Agreement" apparently prepared by Richard Bertram & Co., Bullock's broker in Miami, Florida, where the KATRINA was berthed. This Agreement, executed by Christian and Taylor, recites that it was "made this *18th* day of *March 1971*", identifies Christian as "Employer" and Taylor as "Yacht Captain", and fixes a one week term beginning March 20, 1971. Twice in its printed language the Agreement refers to a "bare boat charter party agreement". Other pertinent provisions include:

"1. Employer hereby hires Yacht Captain as the Master of the said yacht to act as such Master so long as the yacht is under charter to Employer.

"2. Yacht Captain agrees to furnish *1* crewman to assist in operating and navigating the said yacht. . . .

"3. Yacht Captain shall be paid for his services and the services of his crew a total sum of *$200.00,* and Employer shall furnish to the Yacht Captain and his crew quarters and food during the term of this Agreement."

Christian points to several of the provisions in the Charter, particularly the typed language of clause No. 4, as indicating the intent of the parties to create a "time charter".[4] In the alternative, he argues that the Charter and the Agreement are ambiguous and that extrinsic evidence was essential to ascertain the intent of the contracting parties. Bullock points to various provisions in the Charter and the Agreement, particularly, the references in the Agreement to a "bare boat charter party agreement", and argues that the language of the instruments is

---

[4] "The time charter is used where the charterer's affairs make it desirable for him to have tonnage under his control for a period of time, without undertaking the responsibility of ship navigation and management or the long-term financial commitments of vessel ownership." G. Gilmore & C. Black, The Law of Admiralty, 171 (1957).

A finding that this was a time charter would be tantamount to a finding that Taylor was not acting in the employment of Christian and that Christian was therefore not vicariously liable. *See Guzman* v. *Pichirilo,* 369 U.S. 698 (1962); *Fitzgerald* v. *A.L. Burbank & Co.,* 451 F.2d 670 (2d Cir. 1971).

unambiguous and clearly shows the intent of the parties to enter into a bare boat charter, the ultimate legal consequence of which is Christian's vicarious liability for Taylor's negligence.[5]

The Charter and the Agreement were executed in Florida, and we look to Florida law in construing them. *Lackey* v. *Virginia Surety Co.*, 209 Va. 713, 167 S.E.2d 131 (1969).

The primary goal in the construction of written contracts is to determine the intent of the contracting parties, and intent is to be determined from the language employed, surrounding circumstances, the occasion, and apparent object of the parties. *Underwood* v. *Underwood*, 64 So. 2d 281, 288 (Fla. 1953). The Charter and Agreement should be construed together, *see Grier* v. *M. H. C. Realty Corp.*, 274 So. 2d 21 (Fla. App. 1973), and Charter typewritten provisions should be accorded more weight than printed form clauses. *Dominica Mining Co.* v. *Port Everglades Towing Co.*, 318 F. Supp. 500, 504 & n. 6 (S.D. Fla. 1969).

> "In determining whether a given rental agreement, or charter party, as it is termed in admiralty, is or is not a bare boat charter, the crucial test is one of *control.* ... To create a demise, the owner of the vessel must completely and exclusively relinquish possession, command, and navigation of the vessel to the charterer. Guzman v. Pichirilo, 369 U.S. 698, 700, 82 S. Ct. 1095, 8 L.Ed.2d 205 (1962). A presumption exists that a charter party is not a demise, and an owner who seeks to escape liability thereby has the burden of establishing that the charter *was* a demise. E.g. Guzman v. Pichirilo, supra; cf. Stevens v. Seacoast Company, 414 F.2d 1032 (5th Cir. 1969)." *Potashnick-Badgett Dredging, Inc. v. Whitfield,* 269 So. 2d 36, 43 (Fla. App. 1972).[6]

---

[5] The parties agree that Christian's liability, if any, must be predicated on a finding that the negligent Captain Taylor was in his employment at the time of the loss of the KATRINA. The trial court's construction of the Charter and Agreement as a bare boat charter is tantamount to such a finding. In a bare boat (demise) charter "the charterer takes over the ship, lock, stock and barrel, and mans her with his own people. He becomes, in effect, the owner *pro hac vice* . . ." G. Gilmore & C. Black, The Law of Admiralty, 171 (1957).

[6] The burden upon an owner seeking to be relieved of legal responsibilities normally incident to ownership is a heavy burden. *Fitzgerald* v. *A. L. Burbank & Co.*, 451 F.2d 670, 676 (2d Cir. 1971).

Applying these contract construction principles and the rule in *Whitfield,* we examine the two documents to determine whether there is any ambiguity concerning control of the vessel.

█ Charter clause No. 5 permits the charterer to "decide the general course of the voyage and the ports of call". But "the mere fact that the charterer has some control over the master [citation omitted] or that the charterer selects the routes to be taken . . . does not make him the owner *pro hac vice." Fitzgerald* v. *A. L. Burbank & Co.,* 451 F.2d 670, 676 (2d Cir. 1971). And the rule in *Whitfield* is that "[t]o create a demise, the owner of the vessel must completely and exclusively relinquish possession, command, and navigation of the vessel to the charterer." Another portion of charter clause No. 5 appears to deny the charterer such control, for it provides that "the Captain shall be responsible for the safe navigation of the vessel and the Charterer shall abide by his judgement as to sailing, weather, anchorages, and other pertinent matters." [7] With reference to control of the vessel, the language of Charter clause No. 5 leaves the reader in doubt, and what the owner and charterer intended can be determined only from extrinsic evidence.

One of the measures of the charterer's control of the vessel is the scope of use permitted by the Charter. The degree of control evidenced by the limited use permitted by clause No. 9 does not require a bare boat charter, and, "anything short of . . . a complete transfer is a time or voyage charter party or not a charter party at all. . . . [C]ourts are reluctant to find a demise when the dealings between the parties are consistent with any lesser relationship." *Guzman* v. *Pichirilo,* 369 U.S. 698, 700 (1962).

Who controlled the yacht's captain is the crucial inquiry. Generally, one of the standards of an employer-employee

---

[7] Bullock argues that this clause merely states in lay language, for the benefit of lay charterers, the nautical responsibilities and authority which maritime law places upon masters of ships and in no way limits the charterer's control over the vessel. This argument is a tacit acknowledgment of the technical and specialized quality of the vocabulary employed in documents used in maritime commerce. "The phrasing of charters is laconic, and a single short (and often, to the uninitiate, obscure) expression may refer to a whole set of complicated practices perfectly familiar to those who deal regularly in such matters." G. Gilmore & C. Black, The Law of Admiralty, 172 (1957). Reason and equity dictate that a vessel owner who provides a sophisticated maritime contract with the intent to shift legal responsibilities to an uninitiated layman should bear a particularly heavy burden of proving a meeting of the minds on the meaning and effect of the language employed.

relationship is a commitment to pay wages. The language of the two documents leaves it unclear whose commitment it was to pay Taylor's wages. The typed portion of Charter clause No. 4 provides that "Charter fee of $1200.00 includes services of crew quoted on attached agreement." Agreement clause No. 1 provides that Christian "hereby hires Yacht Captain", and Agreement clause No. 3 provides that "Yacht Captain shall be paid for his services and the services of his crew" the sum of $200.00. Read together, this language could be construed to mean that Christian was obliged to pay the full $1200.00 to the owner who was to pay Taylor $200.00. In the alternative, it could be construed to mean that Christian was obliged to pay the owner $1000.00 and Taylor $200.00. Only extrinsic evidence could clarify the ambiguity.

With respect to the contractual commitments exchanged by Bullock and Christian and the vicarious tort liability that flows from those commitments, what is important is not what Taylor intended his employee status to be but what the contracting parties intended it to be. It is impossible to determine from the face of the contract documents what Christian and Bullock intended. One document, the Agreement, indicates that Christian and Taylor intended to create a Christian-Taylor relationship. The other document, the Charter, since it shows that Bullock was the actual owner and that Taylor signed it for him two days before Christian signed, indicates that Christian and Taylor recognized that a Bullock-Taylor relationship existed. But, to repeat, the question raised by this facial ambiguity is not what Taylor intended but whether Bullock and Christian intended one relationship to end and a new one to begin. The answer to that question is to be found only in evidence *de hors* the written documents.

The trial court ruled that the two documents "constitute a bare boat charter". It is true that the Agreement twice referred to a "bare boat charter party agreement". Such terminology is indicative of the intent of the parties but is not conclusive. *Potashnick - Badgett Dredging, Inc.* v. *Whitfield, supra,* 269 So. 2d at 43-44; H. Cooley, Chartering and Charter Parties, 72 (1947).

One of the characteristic indicia of a bare boat charter is the charterer's commitment to bear the operating expenses of the vessel during the charter period. J. Bes, Chartering and Shipping Terms, 18 (7th ed. 1970); Keenan, *Charter Parties and Bills of*

*Lading,* 42 Marq. L. Rev. 346, 347 (1959). Charter clause No. 6 as it originally appeared in the printed form provided in part that "Charterer agrees to pay all running expenses during the term of the Charter. . . ."

But that printed clause was deleted. Typewritten Charter clause No. 4 states in part that "$504.00 [is] to be paid on boarding for all expenses except liquor and soft drinks." There was no provision for refund of any part of that payment not actually used or for payment of an additional sum if running expenses should exceed $504.00. Since the actual costs of operation could not have been calculated precisely in advance, it would seem that both parties agreed that, in consideration of the advance payment of a lump sum by the charterer, the owner would pay the running expenses normally borne by the charterer under a bare boat charter. While this departure from the norm is not controlling, it is probative and should be considered in context with all other evidence relevant to the question whether the owner and charterer intended to enter into a bare boat charter or a time charter.

For error in excluding extrinsic evidence necessary to clarify ambiguities on the face of the written documents concerning the intent of the contracting parties as to the nature of the Charter and Taylor's employment status, the judgment is reversed and the case is remanded for a new trial on the claim and counterclaim, but the cost of printing the excerpts of depositions in the Appendix will be borne by Christian.

*Reversed and remanded.*