**BELL BCI COMPANY, Plaintiff,**

v.

**OLD DOMINION DEMOLITION CORP., et al., Defendants.**

No. CIV.A.03–489–A.

United States District Court,
E.D. Virginia.
Alexandria Division.

Dec. 17, 2003.

Charlie C.H. Lee, Moore & Lee LLP, McLean, VA, for Plaintiffs/Movants.

Robert Knight Cox, Watt Tieder Hoffar & Fitzgerald LLP, McLean, VA, Christopher Stuart Moffitt, Eric R. Stanco & Associates, Alexandria, VA, for Defendants/Respondents.

## MEMORANDUM OPINION

ELLIS, District Judge.

In connection with the issuance of subcontractor performance or payment bonds, sureties typically require subcontractors to agree, by contract, that in the event the bond is triggered by the subcontractor's breach of its contract with the prime contractor, the subcontractor will (1) indemnify the surety and (2) assign to the surety the authority to settle any claims brought by the prime contractor against the subcontractor. Also typical is a provision in the indemnity agreement between the subcontractor and the surety that, in the event of a breach of that agreement, all rights in and to the bonded obligation are assigned to the surety and the surety becomes the subcontractor's attorney-in-fact in that regard.

This case presents the question, not yet specifically resolved in Virginia, whether

the assignment of settlement authority to the surety in the event of a subcontractor's breach includes the right to settle and release any counterclaim asserted by the subcontractor against the prime contractor.

# I.[1]

Plaintiff Bell BCI Company ("Bell") is a Maryland corporation engaged in the construction contracting business and duly authorized to transact business in Virginia. On August 18, 1999, Bell entered into a contract ("Contract 4") with the Alexandria Sanitation Authority ("the Authority") for the general construction of the Alexandria Wastewater Treatment Facility, Nitrogen Compliance Facility, Contract # 4. On March 20, 2002, Bell entered into a second contract ("Contract 6") with the Authority for the general construction of the Advanced Wastewater Treatment Facility Upgrade—Package D, Contract # 6. Bell subsequently entered into two subcontracts with defendant Old Dominion Demolition Corporation ("ODDC"), a Virginia corporation, under which ODDC was to perform demolition, disposal, dewatering, excavation, backfill and site preparation work required under Bell's corresponding general contracts with the Authority. Subcontract 6 was entered into on April 29, 2002, while Subcontract 4 was entered into on May 15, 2002.

Defendant Developers Surety and Indemnity Company ("the Surety"), an Iowa corporation, issued performance and payment bonds on behalf of ODDC, as principal, under which it guaranteed ODDC's performance under Subcontracts 4 and 6, as well as payment by ODDC to its subcontractors and suppliers on the bonded projects. In addition, on May 15, 2002, defendant American Reinsurance Company ("AmRe"), a Delaware corporation, executed a Sitework Reinsurance Agreement under which it counter-secured the Surety's obligations under the performance bond issued in connection with Subcontract 6.

In partial consideration for issuance of the bonds on ODDC's behalf, ODDC executed an Indemnity Agreement in favor of the Surety.[2] Under the terms of the Indemnity Agreement, ODDC agreed, *inter alia*, to "indemnify and hold harmless Surety from and against all liability, loss, claims, demands, costs, damages, attorneys' fees and expenses of whatever kind or nature" incurred by the Surety as a result of issuing bonds on behalf of ODDC. In addition, ODDC agreed to deposit with the Surety, upon demand, collateral in the amount equal to any reserve set by the Surety. Importantly, under paragraph 2.1 of the Indemnity Agreement, ODDC assigned the Surety "the right in its sole and absolute discretion to determine whether any claims under a Bond shall be paid, compromised, defended, prosecuted or appealed." Additionally, in the event of a breach of the Indemnity Agreement by ODDC, paragraph 7 of that Agreement operates to assign to the Surety all of ODDC's rights in and to the Subcontracts between ODDC and Bell. Under paragraph 12, ODDC also designates the Surety "as its attorney-in-fact with the right and power, but not the obligation, to exer-

**1.** Facts relating to Bell's claims against ODDC and ODDC's counterclaim against Bell are taken from Bell's complaint and ODDC's counterclaim. Facts relating to the Indemnity Agreement and the settlement in this case are taken from the Surety's Memorandum in Support of its Motion to Enforce Settlement and to Dismiss Affirmative Claims of ODDC and ODDC's Memorandum in Opposition to the Surety's Motion.

**2.** The Indemnity Agreement was also executed in favor of the Surety with respect to bonds issued for ODDC on contracts other than Subcontracts 4 and 6 and hence applies to those other contracts as well.

cise all of the rights assigned, transferred and set over to Surety by [ODDC] under this Agreement . . . ."

ODDC did not ultimately complete performance of its work under Subcontracts 4 and 6. According to ODDC, Bell was more than six months late in releasing some areas of the work site to ODDC and then required that ODDC complete the work on an unreasonably expedited schedule. When ODDC declined to adhere to this schedule, Bell declared a breach and terminated ODDC's subcontracts. While Bell and ODDC dispute which of them was the first to breach, the undisputed record reflects that ODDC, contrary to its obligations under the Indemnity Agreement, had failed to pay some of its subcontractors and suppliers.

Indeed, it is undisputed that the Surety received payment bond claims from ODDC's subcontractors and suppliers on the bonded projects in excess of $485,000. The Surety also received payment claims on two other projects bonded for ODDC. Currently, the record reflects that the Surety has paid $411,498.75 in resolving some of those claims and anticipates that it may be obligated to pay some or all of the remaining payment claims. Pursuant to paragraph 5.3 of the Indemnity Agreement, a failure on the part of ODDC "to pay for labor and materials ordered for or used in connection with" a bonded Obligation—here the Subcontracts—relating to development of real property or construction of improvements upon real property constitutes a default under the Indemnity Agreement. There is no dispute that the Subcontracts between Bell and ODDC relate to development of real property or construction of improvements upon real property.

On April 16, 2003, Bell filed suit against ODDC, the Surety, and AmRe, alleging that ODDC breached its Subcontracts by failing to perform the work required under the Subcontracts. Specifically, Bell alleged that ODDC failed to perform its work under the Subcontracts in a proper and timely manner and that ODDC had failed to give timely written notice of alleged claims against Bell in breach of its obligations under the Subcontracts. In addition to seeking contract damages from ODDC, Bell also sought recovery from the Surety and AmRe under the performance bonds and Sitework Reinsurance Agreement. In response, ODDC denied any breach of the Subcontracts and asserted a counterclaim against Bell, contending that Bell had breached its obligations under the Subcontracts to ODDC by unreasonably delaying the release of work areas under Subcontract 4 for more than six months and directing that work be completed on an unreasonably accelerated schedule, and by improperly terminating the Subcontracts. Additionally, ODDC alleged that Bell owed ODDC money for work performed under the Subcontracts, and that Bell's retainage of ten percent of ODDC's subcontract progress payments was a violation of certain Virginia statutes. *See* Va.Code § 2.2–4333 (limiting retainage to five percent of progress payments for public construction contracts); Va.Code § 2.2–4354 (listing payment clauses to be included in any contracts awarded by a state or local government agency).

As often occurs in these construction project disputes, the prime contractor has settled with the Surety, but not with the subcontractor. Specifically, the Surety and AmRe reached a settlement agreement with Bell under which the Surety agreed to pay Bell $275,000 in full settlement of this action, including a release of all claims against the Surety and AmRe and the claims and counterclaim between Bell and ODDC. Bell, the Surety, AmRe, and the Surety on behalf of ODDC, further agreed to endorse and submit to the court a Proposed Order pursuant to Rule 41(b),

Fed.R.Civ.P., dismissing the civil action in its entirety, with prejudice and without costs. The settlement fully discharges the Surety on its performance bonds and AmRe of any and all obligations under the terms of the Sitework Reinsurance Agreement. As noted, the settlement also purports to resolve the claims and counterclaim between Bell and ODDC. In this respect, the Surety represented to Bell in the settlement that the Surety has the authority to act on ODDC's behalf and in its stead under the terms of the Indemnity Agreement and it is expressly understood by the Surety that Bell is relying upon that representation in entering into the settlement. Accordingly, under the settlement agreement, the Surety, at its expense, is obligated to oppose any objection by ODDC to the dismissal of the civil action and to take whatever actions may be necessary to enforce and give effect to the settlement. Bell, for its part, has agreed to support the Surety's efforts in this regard.[3] ODDC did not take part in the settlement negotiations or agreement.

In this action, Bell's claims against the Surety total approximately $875,000, exclusive of attorneys' fees and costs. ODDC contends that its counterclaim against Bell is worth, at a minimum, $576,808.51. Prior to settlement, ODDC informed the Surety that it was insolvent and, accordingly the Surety was anticipating additional liability on the bonds it issued for ODDC. Additionally, the Surety made demand under the Indemnity Agreement for ODDC to indemnify it from the various performance and payment claims against the Bonds and demanded deposit of the required collateral security in the amount of the Surety's reserves pursuant to paragraph 3 of the Indemnity Agreement. The Surety also requested an explanation of how ODDC intended to reimburse it for the losses it had already incurred on the bonds. It appears that ODDC did not respond to these demands. Further, it appears that the Surety's settlement of the action was formally reached after these demands were made.

The Surety now moves to enforce the settlement reached between Bell, the Surety, AmRe, and the Surety on ODDC's behalf and to dismiss ODDC's counterclaim.[4]

## II.

There is no dispute that Virginia law governs the interpretation of the Indemnity Agreement. This result follows from the rule in *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (a federal court sitting in a diversity jurisdiction case must apply choice of law rules of the forum state) and from the fact that the Indemnity Agreement was executed in Virginia. *See Christian v. Bullock*, 215 Va. 98, 205 S.E.2d 635, 638 (1974) (stating that Virginia law governs contracts made in Virginia unless a valid contractual provision dictates a different choice of law).

---

3. Indeed, the settlement agreement provides that in the event the Surety's motion to enforce the settlement is denied and ODDC is permitted to pursue its counterclaim against Bell, the Surety will defend Bell and hold it harmless from this counterclaim. Should this occur, Bell is required to tender its defense of the counterclaim to the Surety and cooperate fully in the defense of Bell against ODDC's counterclaim.

4. Although the Surety's motion to enforce the settlement effectively seeks a declaratory judgment concerning the parties' rights under the Indemnity Agreement and the Subcontracts, no party has suggested that this is not the appropriate procedural vehicle, and at least one other court has found that a motion to enforce settlement is the appropriate procedural vehicle. *See Hutton Constr. Co. v. County of Rockland*, 1993 WL 535012 (S.D.N.Y. Dec.22, 1993), *aff'd*, 52 F.3d 1191 (2d Cir.1995).

■ The applicable Virginia contract law principles are well-settled. Unambiguous contractual terms are given their plain meaning. *See Pysell v. Keck,* 263 Va. 457, 559 S.E.2d 677, 678 (2002) (contracts are generally subject to certain familiar rules of construction "including the application of the plain meaning of unambiguous contractual terms"). And, in this specific context, when there is an express indemnity agreement between a surety and a subcontractor, the "surety is entitled to stand upon the letter of his contract." *Fidelity & Deposit Company of Maryland v. Bristol Steel & Iron Works, Inc.,* 722 F.2d 1160, 1163 (4th Cir.1983). The governing Indemnity Agreement provisions are clear and unambiguous and must therefore be applied in accordance with their plain meaning. Thus, paragraph 2.1 of the Indemnity Agreement unambiguously gives the Surety "the right in its sole and absolute discretion to determine whether any claims under a Bond shall be paid, compromised, defended, prosecuted or appealed." As a result, the Surety clearly had the right to settle Bell's claims against ODDC and the Surety. Equally unambiguous are the Indemnity Agreement provisions—paragraphs 7 and 12— that assign ODDC's rights in the Subcontracts to the Surety in the event of a default under the Indemnity Agreement by ODDC, and in that event make the Surety ODDC's attorney-in-fact. Because there is no dispute that a default occurred when the Surety received and paid claims from ODDC's subcontractors and suppliers on the bonded projects, it follows that the assignment and attorney-in-fact provisions were triggered, conferring on the Surety the authority to settle and resolve not just Bell's claims against ODDC, but also ODDC's counterclaim against Bell.

Notwithstanding the clarity of the contract language requiring this result, ODDC raises several objections to the settlement of its counterclaim against Bell. Specifical-ly, ODDC contends that its counterclaim against Bell is meritorious because Bell, not ODDC, was the first to breach the Subcontracts and, as a result, ODDC suffered very substantial damages. ODDC further claims that the Surety's agreement to give up this valuable counterclaim simply to limit its bond liability to Bell reflects the Surety's bad faith, which should serve to bar the Surety's settlement of the counterclaim. ODDC, moreover, contends that because the Subcontracts require Bell's written approval for all assignments and because no such writing exists, no assignment of the Subcontracts occurred and hence the Surety had no authority to settle ODDC's counterclaim. These arguments, separately addressed here, are unpersuasive.

■ ODDC first argues that since paragraph 8 of Subcontracts 4 and 6 does not allow ODDC to "assign the whole or any part of Work or this Agreement without [the] prior written approval of Bell," the Surety could not settle the counterclaim with Bell because the assignment of the Subcontracts to the Surety was invalid, as Bell did not give any such prior approval. The obvious and fatal flaw in this argument is that only Bell, not ODDC, has standing to object to the absence of a writing reflecting Bell's approval of the assignment. And, it is equally obvious that Bell does not wish to object to the assignment on this basis and indeed, to the contrary, supports the assignment and effectively waives the written consent requirement. In other words, the Subcontracts' requirement of prior written approval by Bell to any assignment is of no avail to ODDC and is no bar to the assignment of the Subcontracts to the Surety pursuant to the Indemnity Agreement. This result is simply a reflection of the well-established contract principle that "[a] contract term prohibiting assignment of rights under the contract, unless a dif-

ferent intention is manifested .... is for the benefit of the obligor [here Bell], and does not prevent the assignee from acquiring rights against the assignor ...." Restatement (Second) of Contracts § 322 (1981).[5]

ODDC's reliance on *Burck v. Taylor*, 152 U.S. 634, 14 S.Ct. 696, 38 L.Ed. 578 (1894), to argue otherwise is misplaced. In *Burck*, the Supreme Court found an anti-assignment provision "binding, not only upon the parties, but upon all others who sought to acquire rights in it." *Id.* at 649, 14 S.Ct. 696. Apart from the fact that more recent jurisprudence holds overwhelmingly to the contrary,[6] *Burck* itself is clearly distinguishable from this case. At issue in *Burck* was a contract that had been assigned numerous times; the suit ultimately involved two assignees: plaintiff, who was assigned his interest in the contract without the obligor's consent, and defendant, who was assigned his interest in the contract with the obligor's consent. Plaintiff sued defendant for a share of the profits from the contract. The question was simply which assignment was valid. The Supreme Court held that the assignment to plaintiff was invalid and therefore created only a personal obligation that *could be enforced against the assignor.* Moreover, in reaching this conclusion, the Supreme Court also noted that the obligor never *"in any form* recognized the plaintiff, or his immediate grantor, as having any interest in, or control of, the contract,

or any part thereof." *Id.* at 646, 14 S.Ct. 696 (emphasis added). To both the obligor and the defendant, who actually performed the work under the contract, plaintiff was "an unknown party until after the full completion of the contract, when for the first time he appear[ed] claiming an interest in the profits by virtue of an assignment and transfer, made before the work was done, and in disregard of the terms of the contract." *Id.*

*Burck*'s facts are quite different from those presented here. In contrast to the obligor in *Burck*, Bell was at all times aware of the Surety; indeed the Subcontracts themselves required ODDC to furnish Bell performance and payment bonds through an acceptable surety. Moreover, through the settlement, Bell effectively waived its right to challenge the assignment of the Subcontracts to the Surety.[7] Indeed, the terms of the settlement make clear that Bell supports the Surety's efforts to enforce and give effect to the settlement. It is clear, therefore, that Bell does not object in any way to the assignment, and that the anti-assignment provisions in the Subcontracts are for Bell's benefit and protection. As a result, these anti-assignment provisions do not render the assignment of the Subcontracts to the Surety, by operation of the Indemnity Agreement, invalid.

■ Next, ODDC argues that notwithstanding the fact that, by its terms, the

---

**5.** *See also Fox–Greenwald Sheet Metal Co. v. Markowitz Bros., Inc.,* 452 F.2d 1346, 1351 (D.C.Cir.1971) ("Judicial holdings sustain overwhelmingly the proposition that a contractual ban on assignment ordinarily serves to protect the obligor alone, and in no way imperils the transaction as between assignor and assignee."); *Tycon Tower I Inv. Ltd. Partnership v. Glen Const. Co., Inc.,* 1995 WL 1055818 (Va. Cir. Ct. Mar.27, 1995) ("[U]nless the parties make plain their intent that an unapproved assignment is void, a violation of the [anti-assignment] provision gives rise only

to a suit for damages against the assignor, not an invalidation of the [assignment] contract precluding the assignee from enforcing the contract against the obligee.").

**6.** *See Fox–Greenwald Sheet Metal Co.,* 452 F.2d at 1351 (listing cases).

**7.** To dispel any possible ambiguity on the subject of waiver, Bell, by counsel, expressly waived its right to challenge the assignment of the Subcontracts to the Surety at the hearing in this matter.

Indemnity Agreement gives the Surety the authority to settle ODDC's counterclaim against Bell, courts, as a general matter, should not allow sureties to settle a subcontractor's affirmative claims against a prime contractor, especially given the potential for bad faith settlements. It appears that neither the Supreme Court of Virginia nor the Fourth Circuit has squarely addressed this question. There is, however, a strikingly similar Second Circuit decision, which is instructive. In *Hutton Construction Co. v. County of Rockland,* 52 F.3d 1191 (2d Cir.1995), a Second Circuit panel affirmed a district court's order enforcing a settlement that included the surety's agreement to dismiss the affirmative claims of its objecting principal subcontractor against the prime contractor. There, as here, the subcontractor's failure to make certain indemnity payments constituted a breach of its obligations to the surety, thus activating an assignment clause assigning all of the subcontractor's rights growing out of the bonded construction projects to the surety. *Id.* at 1192. And, as in this case, there was also an attorney-in-fact clause that unambiguously appointed the surety as the subcontractor's attorney-in-fact with the power to exercise all rights assigned to it under the indemnity agreement. *Id.* Agreeing with the district court, the Second Circuit panel held that the assignment clause and the attorney-in-fact provision gave the surety the authority to settle all claims on behalf of the principal, "including not only claims against the Sureties 'upon

the bonds,' but also [the subcontractor's] affirmative claims growing out of its insured contracts." *Id.* The same result should obtain here for essentially the same reasons. And, it is worth noting that this is a commercially sensible result, for it is doubtful that any surety would find it sensible to accept a contractual right to settle that did not include the authority to settle a subcontractor's counterclaim. Without such authority, a surety's right to settle would often be ineffective because a prime contractor would likely be unwilling to settle its claims against the surety without also settling any counterclaim the subcontractor has against the prime.

Finally, ODDC argues that the settlement agreement should not be enforced because the Surety did not settle its counterclaim in good faith. In support of this argument, ODDC contends that it was owed a minimum of $576,808.51 for work performed at the time of Bell's termination of the Subcontracts and that these unpaid monies were included in ODDC's counterclaim against Bell. As a result, ODDC argues that the settlement, by allowing Bell to keep the monies owed to ODDC by dismissing the counterclaim and requiring a payment to Bell of $275,000, is the equivalent of paying Bell $851,808, a sum ODDC contends is slightly higher than Bell's specified damages. Consequently, ODDC argues that the Surety paid Bell an "unquestionably unreasonable sum of money."

 This argument assumes, of course, that ODDC would unquestionably prevail on its counterclaim, an assumption that appears unwarranted.[8] More importantly,

---

**8.** Although denied as moot in light of the resolution of the Surety's motion to enforce settlement and dismiss affirmative claims of ODDC, Bell had filed a motion for summary judgment, or alternatively partial summary judgment, in this case. In support of this motion, Bell persuasively argued, *inter alia,* that ODDC was the first to breach the Subcontracts and that any subsequent breach by

Bell would trigger paragraph 14 of the Subcontracts, exclusively limiting Bell's liability to "reimbursement for reasonable direct expenditures and costs for materials and equipment incurred prior to termination." Additionally, Bell's motion persuasively puts in doubt the likelihood of ODDC's prevailing on its counterclaim.

however, this is not the proper forum for ODDC to make its "bad faith" argument. Indeed, the case on which ODDC relies in this regard stands not for the proposition that settlement should not be enforced in these circumstances, but rather for the proposition that a surety cannot *seek indemnification* from its principal when the surety fails to conduct a reasonable investigation of the claims under which payment is made. *See Transamerica Premier Ins. Co. v. Turf Specialists of Northern Virginia, Inc.,* 1993 WL 945965 (Va. Cir. Ct. Feb.18, 1993) (further holding that the surety's failure to investigate reasonably in that case "reflect[ed] something less than a good faith exercise of discretion"). Significantly, ODDC makes no claim that the Surety failed to conduct a reasonable investigation of Bell's claims or ODDC's counterclaim.[9] Yet, even assuming *arguendo* that ODDC's bad faith argument is valid, such an argument is properly asserted as a defense to the Surety's claim against ODDC for indemnification. It appears that the Surety has filed just such a suit in Alexandria Circuit Court. *See Developers Surety & Indemnity Co. v. Old Dominion Demolition Corp.,* No. CH03001938 (Va. Cir. Ct. filed Dec. 5, 2003). Therefore, ODDC may properly assert the bad faith defense there and, should it prevail, ODDC may avoid paying $275,000 indemnity to the Surety. Indeed, ODDC in that suit may be able to recover from the Surety the value of its counterclaim if it establishes not only the Surety's bad faith in settling the counterclaim, but also the merits of the counterclaim.

### III.

In summary, therefore, defendant Surety's Motion to Enforce Settlement and to Dismiss Affirmative Claims of ODDC must be granted.

An appropriate order has issued.

---

**9.** Moreover, although the matter is not decided, if there is any bad faith in the Surety's settlement of ODDC's counterclaim, it is certainly not obvious from the record in this case.