PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-2176

ELDERBERRY OF WEBER CITY, LLC, a Virginia limited liability company,

Plaintiff - Appellee,

v.

LIVING CENTERS – SOUTHEAST, INCORPORATED, a North Carolina corporation; FMSC WEBER CITY OPERATING COMPANY, LLC, a Delaware limited liability company; CONTINIUMCARE OF WEBER CITY, LLC, a Florida limited liability company; MARINER HEALTH CARE, INCORPORATED, a Delaware corporation,

Defendants - Appellants.

Appeal from the United States District Court for the Western District of Virginia, at Lynchburg.  Norman K. Moon, Senior District Judge.  (6:12-cv-00052-NKM-RSB)

Argued:  January 28, 2015                    Decided:  July 21, 2015

Amended:  August 10, 2015

Before MOTZ, GREGORY, and WYNN, Circuit Judges.

Affirmed in part, vacated in part, and remanded with instructions by published opinion.  Judge Gregory wrote the opinion, in which Judge Motz and Judge Wynn joined.

**ARGUED:** James F. Segroves, HOOPER, LUNDY & BOOKMAN, PC, Washington, D.C., for Appellants.  James Strother Crockett, Jr., SPILMAN THOMAS & BATTLE, PLLC, Charleston, West Virginia, for Appellee.  **ON BRIEF:** Lori D. Thompson, LECLAIRRYAN, PC, Roanoke, Virginia, for Appellants.  Travis A. Knobbe, M. Mallory Mantiply, SPILMAN THOMAS & BATTLE, PLLC, Roanoke, Virginia, for Appellee.

GREGORY, Circuit Judge:

Plaintiff-appellee Elderberry of Weber City, LLC ("Elderberry") filed this civil action in the Western District of Virginia alleging breach of a lease for a skilled nursing facility against defendants-appellants Living Centers – Southeast, Inc. ("Living Centers"), FMSC Weber City Operating Company, LLC ("FMSC"), and ContiniumCare of Weber City ("Continium"), and breach of a guaranty contract against defendant-appellant Mariner Health Care, Inc. ("Mariner"). Separately, in the Northern District of Georgia, Mariner filed a declaratory judgment action against Elderberry, seeking a declaration that it had no obligations under the guaranty. The two actions were consolidated in the Western District of Virginia. The district court denied the parties' cross motions for summary judgment but held that the guaranty was enforceable against Mariner. Following a bench trial, the district court entered judgment in favor of Elderberry on all counts, and found the appellants jointly and severally liable for accrued and future damages amounting to $2,742,029.50, plus pre- and post-judgment interest at the rate of 0.13%. Because the district court erred in awarding damages that accrued after the termination of the lease, we vacate in part and remand for the district court to recalculate damages for the appropriate time period.

# I.

At the center of this lease and contract dispute is a skilled nursing facility located in Weber City, Virginia. Elderberry leased the facility to Living Centers in November 2000 for a 10-year term. Initially, Living Centers was not permitted to assign the lease without prior written permission from Elderberry. However, in 2006, the lease was amended to allow Living Centers to assign the lease to FMSC or any of its subsidiaries or affiliates without prior approval from Elderberry so long as Living Centers first obtained a guaranty from Mariner.[1] In accordance with the amendment, the lease reset for a new 10-year term commencing at the completion of certain construction and improvements to the facility, and thus a new lease expiration date was set for April 2017. The required guaranty was attached as Exhibit E to the lease amendment, and was signed by then Executive Vice President and Chief Financial Officer of Mariner, Boyd P. Gentry.

On January 18, 2007, Living Centers assigned the lease to FMSC. FMSC, in turn, reassigned it to Continium in November 2011.[2] In the midst of the assignments and amendments, the

[1] Living Centers is a wholly owned subsidiary of Mariner, while FMSC is 75% owned by Mariner through subsidiaries.

[2] Continium is owned and controlled by Avi Klein who was at the time a manager of FMSC.

facility was subject to numerous problems, including being listed as a "Special Focus Facility,"[3] nonpayment of utility vendors, and interruptions of gas and phone service.

Continium ceased making rent payments after March 2012. Although Elderberry and Continium thereafter attempted to negotiate rent reductions, Continium indicated in May 2012 that it was no longer able to make rent payments. Elderberry's attempts to locate a new tenant were initially unsuccessful because of, among other problems, the facility's placement on the Special Focus Facility list.

Eventually, Elderberry hired Smith/Packett Med-Com, LLC ("Smith/Packett") to locate a new tenant, conduct lease negotiations, and provide asset management services. The two entities signed an August 8, 2012 asset management agreement, under which Elderberry agreed to pay Smith/Packett a $150,000 signing fee for securing a new tenant, a $375,000 value fee on June 1, 2015, so long as the new tenant was not then in default under the new lease, and a monthly management fee of 10% of the new tenant's rent payable.

Subsequent to signing the asset management agreement, on August 15, 2015, Elderberry sent Living Centers, Continium,

---

[3] Special Focus Facilities are "subject to more frequent health and safety inspections." J.A. 781.

4

Mariner, and their attorneys at the Bernstein Law Firm a letter demanding immediate payment of past due rent. The letter indicated that if the payments were not made, Elderberry would "be entitled to proceed with pursuit of its remedies under the Lease, including, but not limited to, seeking damages in court, termination of the Lease, and/or taking possession of the Property." J.A. 201-02. The requested past due rent payments were not made. Rather, on August 17, 2012, Continium discharged the remaining residents and abandoned the facility.

On August 24, 2012, Elderberry mailed the appellants a letter bearing the subject line, **"LEASE TERMINATION NOTICE."** J.A. 607. The letter stated: "this letter shall serve as notice that the Lease is hereby terminated, effective 12:00 midnight EST on August 24, 2012. [Elderberry] reserves all rights and remedies related to Tenant's default whether under the Lease, at law or in equity." J.A. 607.

Elderberry rehabilitated the nursing facility with Smith/Packett's help and eventually entered into a new lease with Nova Healthcare Group, LLC ("Nova") for a new 10-year term beginning January 1, 2013. During the course of lease negotiations, Nova secured from Elderberry a renovation budget and working capital totaling $1.25 million.

One week after Elderberry sent the termination letter to the appellants, Mariner filed suit against Elderberry in the

5

Northern District of Georgia, seeking a declaration that the guaranty was unenforceable. Thereafter, Elderberry filed a breach of lease and breach of contract action against the appellants in the Western District of Virginia. Elderberry sought damages for accrued and future rent, as well as "costs, fees and expenses incurred by Elderberry to preserve and rehabilitate the property; fees and expenses incurred by Elderberry in hiring [Smith/Packett] . . . to locate a replacement tenant; sums expended by Elderberry to pay utilities, insurance premiums, and real property taxes; and attorney's fees and expenses." J.A. 7. This consolidated civil action followed.

The parties filed cross motions for summary judgment on Elderberry's breach of lease and breach of contract claims, and on Mariner's claim that the guaranty issued in connection with the lease assignments to FMSC and Continium was void under the Georgia statute of frauds. Although the district court denied both summary judgment motions, it held that the guaranty was valid. After the subsequent bench trial, the district court ruled in favor of Elderberry on all claims, and concluded that Elderberry is entitled to damages in the amount of $2,742,029.50, plus pre- and post-judgment interest at the rate of 0.13%. J.A. 803-06. The damages award includes:

6

(1) unpaid rent for the period from April 2012 through August 2012 . . . ; (2) unpaid rent from the period September 2012 though February 2013 . . . ; (3) a rent shortfall from March 2013 though April 2017; (4) unpaid taxes, utilities, and insurance premiums for the period from August 2012 through February 2013 . . . ; (5) maintenance fees paid during that same period . . . ; (6) payments for architectural and construction services. . . to bring the Facility up to the fire code standards required by the fire marshal; (7). . . payments to Nova [for renovations and working capital] . . . ; (8) [the signing fee to Smith/Packett] . . . ; and (9) [the value fee to Smith/Packett].

J.A. 793 (footnote omitted).

The appellants timely appealed.

## II.

Our review of a district court's grant of summary judgment is de novo. French v. Assurance Co. of Am., 448 F.3d 693, 700 (4th Cir. 2006). "Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Id. And, "[w]e review a district court's judgment entered after a bench trial under a 'mixed standard of review.' Under this standard, we review the district court's findings of fact for clear error and conclusions of law de novo." Perez v. Montaire Farms, Inc., 650 F.3d 350, 363 (4th Cir. 2011) (citation omitted). Our review of the district court's conclusions of law extends to its interpretations of written contracts. See FindWhere Holdings,

7

Inc. v. Sys. Env't Optimization, LLC, 626 F.3d 752, 755 (4th Cir. 2010).

The appellants make three arguments.  First, they argue that the district court erred in awarding damages that accrued after Elderberry terminated the Lease.[4]  Second, they contend that Virginia law precludes awards for speculative damages, and thus the district court's inclusion of the $375,000 value fee in the damage award was erroneous.  Finally, the appellants challenge the district court's legal conclusion that the guaranty satisfies the Georgia statute of frauds.

## III.

The lease states, and the parties agree, that it is governed by Virginia law.  We thus look to Virginia law to construe the lease.  In doing so, we consider two broad categories of damages flowing from the lease:  rent, and non-rent damages.

## A.

We first address what portion of accrued or future rent Elderberry is entitled to receive as part of its damages award. This Circuit has previously observed that

---

[4] "[Appellants] concede that Living Centers is liable for unpaid rent for the period from April 2012 though August 24, 2012."  J.A. 794 n.14.

8

when a tenant abandons leased property during the term, the Supreme Court of Appeals of Virginia has held that the landlord is permitted, at his option, either (1) to refuse to accept the tenant's surrender, do nothing and sue for accrued rents, or (2) to re-enter the premises and accept the tenant's surrender, thereby terminating the lease and releasing the tenant from further liability on the lease.

tenBraak v. Waffle Shops, Inc., 542 F.2d 919, 924 (4th Cir. 1976) (footnote omitted) (citing Crowder v. Virginian Bank of Commerce, 103 S.E. 578 (Va. 1920)). In other words, when a tenant abandons a lease, a landlord may sue for rent due on the balance of the lease term only if the landlord does not terminate the lease. See id.; Crowder, 103 S.E. at 579. The choice belongs to the landlord. Crowder, 103 S.E. at 579 ("The landlord [is] under no obligation to resume possession of the premises which ha[ve] been wrongfully abandoned, and ha[s] the right to refuse such possession and to hold the tenant liable under the contract.").

Although Virginia law "thus does not provide for recovery of future damages for the lessor's losses arising from the abandonment of a contract of lease, . . . the parties are not barred from providing for such a recovery through forfeiture provisions in the lease." tenBraak, 542 F.2d at 924-25. Any such provisions "must be strictly construed." Id. at 925. As the Virginia Supreme Court has stated, "[t]he prevailing rule is that parties to a contract may provide the remedy that will be

9

available to them in case a breach occurs so long as the remedy provided is not contrary to the law or against public policy." Bender-Miller Co. v. Thomwood Farms, Inc., 179 S.E.2d 636, 638 (Va. 1971). And "the remedy provided will be exclusive of other possible remedies only where the language employed in the contract clearly shows an intent that the remedy be exclusive." Id. Additionally, "the intent of the parties as expressed in their contract controls," and "[i]t is the court's responsibility to determine the intent of the parties from the language they employ." Id. at 639.

Here, the relevant provision of the lease, ¶ 7(3), reads as follows:

7. **RIGHTS IN DEFAULT.**

. . . .

(3) The remedies of the Lessor for any Default by the Lessee shall include the following:

(a) Upon any Default by the Lessee and at any time thereafter, the Lessor may give written notice to the Lessee that the Lessor elects to terminate this Lease upon a specific date not less than thirty (30) days after mailing of such notice. This Lease shall then be terminated on the date so specified.

(b) Upon an uncured Default by the Lessee, and notice from the Lessor, the Lessor may reenter and resume possession of the Property. The Lessor, at the Lessor's option, may remove persons and property from the Property and may store the property in a public warehouse or elsewhere at the expense or for the account of the Lessee without liability for any damage on such removal. The Lessor's reentry shall not be deemed either an acceptance or a surrender of this Lease or a termination thereof. It is expressly

10

> understood and agreed that in the event of the reentry by the Lessor by reason of a default of the Lessee, the Lessee shall nevertheless remain liable for the Rent and also for the taxes and insurance premiums payable by the Lessee as provided in this Lease, for the balance of the term herein originally demised.
>
> . . . .
>
> (d) The rights given to the Lessor herein are in addition to any rights which may be given to the Lessor by statute or otherwise.

J.A. 172. Elderberry urges us to conclude that its rights under the above provision are cumulative and that it thus had the right to simultaneously (1) reenter and relet the facility, and (2) terminate the lease and seek from the appellants rent due for the balance of the term. To be sure, the above excerpt provides that Elderberry's rights in the event of a default "shall include the following." Id. There is no language suggesting that Elderberry must choose either to terminate the lease as provided by ¶ 7(3)(a), or to reenter the premises and hold the tenant liable for future rent and other fees as provided by ¶ 7(3)(b). Nor are the various subparagraphs under lease ¶ 7 separated by the disjunctive word "or."

That said, Elderberry's reading of the lease is not convincing. First, remedy provisions providing for future rent "must be strictly construed." tenBraak, 542 F.2d at 925. And in construing remedy provisions, courts must have "due regard for the rule that [the lease] must be construed most strongly against the lessor." Va. Lumber & Extract Co. v. O.D. McHenry

11

Lumber Co., 94 S.E. 173, 174 (Va. 1917).  Here, ¶ 7(3) of the lease does not affirmatively state that the remedial provisions are cumulative.  Rather, ¶ 7(3)(b) explicitly provides:  "The Lessor's reentry shall not be deemed . . . a termination" of the lease.  J.A. 172 (emphasis supplied).  And it is only under ¶ 7(3)(b), "in the event of the reentry," that the lessee remains liable for future rent and fees.  This language puts ¶ 7(3)(a) and ¶ 7(3)(b) in tension with one another.  Whereas ¶ 7(3)(a) explicitly terminates the lease contract, ¶ 7(3)(b) explicitly leaves the terms of the lease contract and the possibility of receiving future rent and fees in place.  It does not make sense to allow simultaneously the termination of the lease and continued application of the lease.  The better reading, and the one we adopt here, is that upon exercising its right to terminate the lease, Elderberry extinguished any right that it had to future rent.

Elderberry argues that we should follow the Virginia rule that a remedy provided for breach of a contract "will be exclusive of other possible remedies only where the language employed in the contract clearly shows an intent that the remedy be exclusive."  Bender-Miller, 179 S.E.2d at 638.  In advancing its argument, Elderberry focuses on whether the remedies provided within the lease are exclusive of one another.  Bender-Miller, by contrast, focuses on whether the remedies provided in

12

a contract are exclusive of extra-contractual remedies. In that case, the Virginia Supreme Court addressed whether the parties "intended by virtue of" a certain contract provision "that the remedy provided therein be exclusive of other remedies allowed by law." Id. at 639 (emphasis added); see also Va. Dynamics Co. v. Payne, 421 S.E.2d 421, 423 (Va. 1992) (observing that even if a lessor could "contract[] away" a statutory right, "the lessor's statutorily created right . . . would have to be expressly waived"); Atlas Mach. & Iron Works, Inc. v. Bethlehem Steel Corp., 986 F.2d 709, 713 (4th Cir. 1993) (permitting bankruptcy as a remedy to a breach of contract where the contract did not explicitly state that the remedy stated therein was exclusive). Our reading of Virginia case law suggests that there is a presumption against excluding statutory or legal rights absent a clear waiver of such rights, and our construction of the lease here comports with that presumption. Although our reading of the lease proscribes the collection of future rent and other fees in the event of termination, it does not proscribe the pursuit of any rights that Elderberry might have outside of those provided in the lease itself. Indeed, as quoted above, ¶ 7(3)(d) provides that "[t]he rights given to the Lessor herein are in addition to any rights which may be given to the Lessor by statute or otherwise." J.A. 172.

13

In light of the foregoing, we hold that Elderberry lost its right to rent that accrued after it terminated the lease on August 24, 2012. Elderberry is, however, entitled to any rent that accrued prior to termination of the lease.

**B.**

We turn next to non-rent damages. A landlord may, as Elderberry does here, seek compensation for a tenant's failure to return a leased facility in the required condition. See, e.g., Sharlin v. Neighborhood Theatre Inc., 167 S.E.2d 334 (Va. 1969). And the Supreme Court of Virginia long ago stated that when an action for breach of lease covenant "is brought after the end of the term, the measure of damages is still held to be such a sum as will put the premises in the condition in which the tenant is bound to leave them." Vaughan v. Mayo Milling Co., 102 S.E. 597, 601 (Va. 1920) (quoting Watriss v. First Nat'l Bank of Cambridge, 130 Mass. 343, 345 (1879)). "[T]his is true even if the repairs have not been made by the landlord." Sharlin, 167 S.E.2d at 338 (citing Vaughan, 102 S.E. at 602). Virginia's rule is in line with the general rule that

> where a lease contains a provision or option giving the right or privilege of cancellation and the agreement is canceled in pursuance of the right or privilege thus given, such cancellation does not extinguish liabilities that have already accrued under the lease, regardless of whether the liability is that of the party who exercised the option to cancel the agreement or is the liability of the party against whom cancellation was made. Such cancellation of the

14

> lease does, however, terminate liabilities to accrue in the future, such as rent, except where by express provision in the lease termination is not to affect the accrual of such liabilities.

49 Am. Jur. 2d Landlord and Tenant § 204 (emphasis added) (footnote omitted). Accordingly, upon termination of a lease, a landlord is entitled to recover liabilities accrued up to the point of termination.

Aside from rent payments, the lease here includes covenants requiring the lessee to pay for utility services, sales and use taxes, general real estate taxes and special assessments, and insurance premiums. See J.A. 165 (Lease ¶ 3). Moreover, the lease provides:

> Lessee will keep the Property and any and all buildings and improvements (including inside and outside) which are now or may be erected or placed on said Property, in good order and repair subject to reasonable wear and tear at its sole cost and expense. All repairs and replacements shall be in quality and class at least equal to the original work. Lessee will pay when due all costs associated with any such repairs, replacements or other work undertaken by it, and will not suffer any mechanic's and/or materialmen's liens to be maintained against the Property.

J.A. 166 (Lease ¶ 4(2)). The lease additionally requires that the premises be returned to Elderberry "in the same condition as when demised to the Lessee, reasonable wear and tear and damage by fire or other casualty insured against being excepted." J.A. 167 (Lease ¶ 4(5)). Another provision states that the lessee "will comply with all lawful requirements of the Board of

15

Health, Police Department, Fire Department, Municipal, State and Federal authorities." J.A. 167 (Lease ¶ 4(6)). Each of these covenants serves as a source of damages that potentially accrued prior to the termination of the lease. Indeed, the district court relied on these provisions in determining several portions of the damages award.

Curiously, the appellants do not directly address whether they challenge the district court's inclusion of utility fees, maintenance fees, and the like in the damages award. They merely ask this Court to reduce the judgment to $220,576.94, the amount of unpaid rent that accrued prior to the termination of the lease. While this request could be seen as an indirect challenge to the award of damages flowing from their breach of the covenants listed above and their failure to return the nursing facility in the required conditions, the appellants did not set forth arguments challenging the district court's factual findings or legal conclusions concerning accrued non-rent damages. They have thus waived any argument with respect to those non-rent damages that accrued prior to termination of the lease. See Carter v. Lee, 283 F.3d 240, 252 n.11 (4th Cir. 2002) ("[T]his Court normally views contentions not raised in an opening brief to be waived.").

In light of the foregoing, we hold that Elderberry is entitled to non-rent damages that accrued prior to termination

16

of the lease.  We therefore remand this case for the district court to recalculate rent and non-rent damages that accrued prior to August 24, 2012.[5]

**IV.**

The appellants argue that the district court erred in finding that the guaranty satisfies the Georgia statute of frauds.[6]  Under Georgia law, "[t]he statute of frauds requires

---

[5] Because damages are restricted to those accruing prior to termination of the lease, we need not address the appellants' contention that the Smith/Packett $375,000 value fee is speculative.  By its terms, that payment necessarily accrued after termination of the lease and therefore cannot be part of the damages award.  Indeed, Elderberry itself categorizes the value fee as future damages.  See Resp. Br. of Appellee 25 n.9.

[6] The choice of law provision in the guaranty at issue here is blank.  Because we are exercising diversity jurisdiction in this case, we must apply the choice of law principles of the state in which the case was filed.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941).  While Mariner's declaratory judgment claims regarding the guaranty were filed in the Northern District of Georgia, those claims were transferred to the Western District of Virginia, and Elderberry's claims concerning the guaranty were also filed in Virginia.  We need not concern ourselves with whether Virginia or Georgia choice of law rules apply, because under either analysis, we would conclude that Georgia law applies.  This is because each state applies the rule of lex loci contractus.  See Seabulk Offshore Ltd. v. Am. Home Assurance Co., 377 F.3d 408, 419 (4th Cir. 2004) (observing that in Virginia, questions of "interpretation of a contract are resolved according to the law of the state where the contract was made"); Ferrero v. Associated Materials Inc., 923 F.2d 1441, 1444 (11th Cir. 1991) ("[T]he Georgia conflict of laws rule for contracts . . . is lex loci contractus.").  And the final act necessary to effectuate the guaranty under either state's law, the signature by Mariner's
(Continued)

17

that a promise to answer for another's debt, to be binding on the promisor, 'must be in writing and signed by the party to be charged therewith.'" John Deere Co. v. Haralson, 599 S.E.2d 164, 166 (Ga. 2004) (citation omitted). "This requirement has been interpreted to mandate further that a guaranty identify the debt, the principal debtor, the promisor, and the promisee." Id.; see also Lafarge Bldg. Materials, Inc. v. Thompson, 763 S.E.2d 444, 445 (Ga. 2014). The guaranty here identifies and is signed by the promisor: Mariner. However, as noted by the appellants, the guaranty includes several blanks where the parties were to have identified the landlord, original tenant, tenant, and the lease:

> **FOR VALUE RECEIVED**, and in connection with the assignment and transfer of the rights of tenant under a certain Lease agreement, dated [_____], between **[LANDLORD]** ("Landlord") and **[TENANT]** ("Original Tenant"), as the same was assigned by Original Tenant to **[NEW TENANT]** ("Tenant"), pursuant to an Assumption and Assignment Agreement, dated [_____] (as further amended, modified or assigned, the "Lease"), covering certain premises known as **[FACILITY NAME AND ADDRESS]**, **Mariner Health Care, Inc.**, a Delaware

representative, took place in Georgia. See Seabulk Offshore, Ltd., 377 F.3d at 419 ("Under Virginia law, a contract is made when the last act to complete it is performed."); Christian v. Bullock, 205 S.E.2d 635, 638 (Va. 1974) (applying law of state in which contract was executed); Gen. Tel. Co. of the Se. v. Trimm, 311 S.E.2d 460, 461 (Ga. 1984) ("In order to determine where a contract was made, the court must determine where the last act essential to the completion of the contract was done."). Neither party disputes the application of Georgia law.

18

corporation, the undersigned (hereinafter referred to as "Guarantor," whether one or more) hereby guarantees unto Landlord the full and prompt payment of the rent and all other sums and charges payable by Tenant under the Lease (hereafter collectively referred to as "Obligations"). Guarantor hereby covenants that if Tenant shall default in the payment of any of the Obligations, Guarantor shall pay the amount due to Landlord.

J.A. 196 (emphasis and blanks in original). The question is thus whether the guaranty nonetheless sufficiently identifies the debt, principal debtor, and promisee.

The Supreme Court of Georgia's recent decision in Lafarge Building Materials examined a situation in which a guaranty was "set off in a box at the bottom of the second page" of a credit application. 763 S.E.2d at 445. The guaranty identified the principal debtor simply as "the Applicant identified on page 1 of this Application for Credit." Id. The guaranty, however, incorporated the credit application by reference. Id. In reversing the Georgia Court of Appeals' conclusion that the guaranty did not satisfy the statue of frauds, the Georgia Supreme Court read the guaranty "in conjunction with the incorporated application, and with the word 'applicant' bearing its usual and common meaning." Id. at 447. While the court noted that "the better practice for lenders—the approach that can forestall extended litigation like this case—is to simply name the principal debtor directly in the guaranty," the court

19

nonetheless concluded that the guaranty satisfied the statute of frauds.  Id.

In addition to approving the use of incorporated documents to sufficiently identify the terms of a guaranty, id. at 447, the Georgia Supreme Court has also recognized that § 24-3-3(a) of the Georgia code[7] "authorizes the use of contemporaneously executed writings to provide necessary terms not contained in the document at issue, or to correct obvious errors in the document at issue."  White House Inn & Suites, Inc. v. City of Warm Springs, 676 S.E.2d 178, 179 (Ga. 2009) ("[A] contemporaneously executed document can provide a property description missing from a contract for the sale of real property; establish the terms of a purportedly vague option agreement; establish and correct a misnomer; correct an 'obvious error'; or establish that the acceptance of an offer was conditional." (citations omitted)).  In discussing the contemporaneous writings rule, the White House Inn court cited with approval C.L.D.F., Inc. v. The Aramore, LLC, 659 S.E.2d 695 (Ga. Ct. App. 2008).  Id.  There, the Georgia Court of Appeals construed a lease and guaranty together to correct a scrivener's error where "the Lease and the Guaranty were executed on the same date, at the same time, and at the same location" and

_____

    [7] Formerly Ga. Code Ann. § 24-6-3.

20

"[t]he Guaranty was physically attached to the Lease and was identified as a 'special provision[] . . . attached . . . as [an] exhibit and . . . made a part of th[e] Lease.'" C.L.D.F., Inc., 659 S.E.2d at 696.

These cases and Georgia's contemporaneous writings rule suggest that omitting a required name or piece of information from a guaranty does not render the guaranty unenforceable if the omitted name or information can be readily ascertained when the guaranty is read in conjunction with documents incorporated by reference, or with documents physically attached to and contemporaneously executed with the guaranty. The guaranty in this case, though containing a significant number of blanks, is attached as Exhibit E to the lease amendment. Thus, we can construe the guaranty together with the lease amendment. And in the lease amendment, the parties agreed that Living Centers would be permitted to assign the lease to "Family Senior Care Holdings LLC or any of its subsidiaries or affiliates" without prior written permission from Elderberry so long as Mariner agreed to guarantee the lessee's obligations. J.A. 180. Reading the blanks in the guaranty together with the lease and the lease amendment, and giving the terms landlord, original tenant, and tenant their usual and common meanings, the guaranty sufficiently identifies Elderberry as the landlord and Living

Centers as the original tenant.[8]  See Lafarge Bldg. Materials, 763 S.E.2d at 447.

However, the blank in the guaranty representing the tenant (i.e., principal debtor) is not filled in with a specific entity, but rather with the descriptive phrase "Family Senior Care Holdings LLC or any of its subsidiaries or affiliates." Because the phrase "Family Senior Care Holdings LLC or any of its subsidiaries or affiliates" is, on its face, susceptible to more than one meaning, we find it to be ambiguous.  See Horwitz v. Weil, 569 S.E.2d 515, 516 (Ga. 2002) ("Ambiguity in a contract is defined as duplicity, indistinctness or an uncertainty of meaning or expression.").  And under Georgia law, we are permitted to consult parol evidence "to explain ambiguities in descriptions."  L. Henry Enters., Ltd. v. Verifone, Inc., 614 S.E.2d 841, 844 (Ga. Ct. App. 2005) ("[W]hile the Statute of Frauds prohibits using parol evidence to supply completely missing terms, it does not prohibit using parol evidence to explain ambiguities in descriptions.").

---

[8] We find it noteworthy that the appellants "volunteered or offered to provide a guaranty of Mariner Health" and wanted to "add that to the amendment in order to procure [Elderberry's] agreement to the assignment."  J.A. 660; see also J.A. 663 ("A guaranty was offered by Mr. Gentry.").  Not only that, but there is uncontradicted testimony in the record that the guaranty was actually "provided by Mr. Gentry" of Living Centers as part of the lease amendment negotiations.  J.A. 663.

22

Using the parol evidence rule here to consult extrinsic evidence, it is clear that the principal debtor at the relevant time was Continium. Living Centers first assigned the lease to FMSC, evidenced by a document entitled "Assignment and Assumption Agreement." J.A. 203. A document cited and quoted by the district court entitled "Assignment and Assumption of Contracts" then demonstrates that FMSC assigned the lease to Continium on November 1, 2011.[9] Elderberry of Weber City, LLC v. Living Centers-Se., Inc., 958 F. Supp. 2d 623, 633 (W.D. Va. 2013). As shown above, Continium stopped paying rent after March 2012 until Elderberry terminated the lease on August 24, 2012. These are the relevant rent payments for which Continium was the principal debtor and for which Mariner guaranteed. Indeed, a September 9, 2011 letter sent to Elderberry by the appellants' attorneys reflects exactly that understanding. See J.A. 199 ("Notwithstanding this proposed assignment [from FMSC to Continium], it is intended that the Mariner Health Care, Inc. Lease Guaranty executed in conjunction with the First Amendment to the Lease Agreement dated June 19, 2006, shall remain in full

---

[9] We note that the parol evidence rule, unlike the contemporaneous writings rule, does not require the extrinsic evidence to have been prepared at the same time. See, e.g., McKinley v. Coliseum Health Grp., LLC, 708 S.E.2d 682, 684–85 (Ga. Ct. App. 2011) (affirming the trial judge's use of parol evidence to grant summary judgment where parol evidence consisted of deposition testimony taken subsequent to the execution of the contract).

23

force and effect to guaranty the obligations of assignee Continium[]."").

Given the Georgia Supreme Court's most recent pronouncement on that state's statute of frauds, combined with Georgia's parol evidence rule, we hold that the guaranty satisfies the Georgia statue of frauds.

## V.

For the foregoing reasons, the judgment of the district court is

AFFIRMED IN PART, VACATED IN PART, AND REMANDED WITH INSTRUCTIONS.
