**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 21-2161

CAROLE ANN SAWYER, on behalf of herself and all others similarly situated,

Plaintiff - Appellant,

v.

TIDELANDS HEALTH ASC, LLC,

Defendant - Appellee.

Appeal from the United States District Court for the District of South Carolina, at Charleston.  Sherri A. Lydon, District Judge.  (2:19-cv-01612-SAL)

Argued:  March 8, 2023                        Decided:  June 15, 2023

Before GREGORY, Chief Judge, NIEMEYER, and RICHARDSON, Circuit Judges.

Affirmed by published opinion.  Chief Judge Gregory wrote the opinion, in which Judge Niemeyer and Judge Richardson joined.

Marybeth E. Mullaney, MULLANEY LAW FIRM, Charleston, South Carolina, for Appellant.  Thomas Alan Bright, OGLETREE DEAKINS NASH SMOAK & STEWART, PC, Greenville, South Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Chief Judge:

In May 2018, Carole Ann Sawyer, a Registered Nurse employed by Tidelands Health ASC, LLC ("Tidelands"), applied for and was granted intermittent leave under the Family and Medical Leave Act ("FMLA"). Sawyer received two written corrective actions for absences she accrued in May, July, and August 2018, which she contends were protected FMLA leave. Then, on August 28, 2018, Tidelands issued Sawyer a Class II corrective action for threatening a coworker, resulting in Sawyer's termination. Sawyer's termination letter explained that the August 28 Class II corrective action constituted her third written corrective action in twenty-four months and her second Class II corrective action during her employment, either of which results in termination under Tidelands' policy. Shortly thereafter, pursuant to its Wage Deduction Policy ("WDP"), Tidelands deducted $261.71 from Sawyer's final paycheck to reduce the balance of her outstanding hospital bills.

Sawyer subsequently sued Tidelands under the FMLA and the South Carolina Payment of Wages Act ("SCPWA"). Her complaint alleges that Tidelands interfered with her FMLA leave by issuing the two written corrective actions for her absences and terminated her in retaliation for taking leave. Sawyer also alleges, on behalf of herself and a putative class, that the WDP improperly withholds employee wages in contravention of the SCPWA. The district court granted summary judgment for Tidelands on both counts, which Sawyer now appeals. For the reasons to follow, we affirm the district court's ruling.

I.

Tidelands is a large healthcare provider with numerous medical facilities in South Carolina, including the Georgetown Memorial Hospital ("Georgetown"). In 2007, Sawyer began her employment with Tidelands as a Certified Nursing Assistant at Georgetown. Once Sawyer obtained her nursing license in 2010, she continued to work at Georgetown as a Registered Nurse.

Pursuant to her employment at Georgetown, Sawyer agreed to the hospital system's WDP, which states:

> In accordance with Section 41-10-30(A) of the South Carolina Code of Law . . ., companies or business[es] are allowed to collect, via deduction from an employee's pay, for monies owed them up to the maximum allowable amount as defined by Federal and South Carolina law. Under applicable law, employers must pay employees minimum wage for each hour worked during a given pay period, but any earnings in excess of that amount may be deducted to cover debts or other financial obligations the employee has with respect to the employer. Therefore, Georgetown Hospital System has adopted a policy for all employees that requires that any current or future debts and financial obligations owed by the employee to the Georgetown Hospital System may be deducted from the employee's wages, including the final paycheck, consistent with Federal and State law.

J.A. 199. The WDP provides "[e]xamples of 'money owed,'" including "[t]he cost of patient services rendered by Georgetown Hospital System to you or other family members for whom you are the guarantor that is not covered by another payment source such as medical insurance." *Id.* Sawyer signed the WDP, and hospital records indicate that she completed trainings on the policy on December 9, 2013, and July 22, 2018.

During her employment with Tidelands, Sawyer received several corrective actions relevant to this appeal. To start, in October 2012, Tidelands issued Sawyer a Class II

3

corrective action for failing to timely complete the annual Basic Life Support renewal course. Under Tidelands' policy, Class II corrective actions are for "[a]cts, omissions or deficiencies on the part of an employee which are of a serious misconduct nature." J.A. 453. Sawyer was suspended from her work schedule until she completed the course. Next, in April 2018, Sawyer's supervisor, Bob Pender, issued her a verbal corrective action for accruing eleven unscheduled absences in twelve months. According to Sawyer, Pender then recommended that Sawyer apply for FMLA leave, which she did on May 17, 2018. As part of Sawyer's FMLA application, Sawyer's health care provider attested that Sawyer "has a known history [of] inappropriate sinus tachycardia and POTS (Postural Orthostatic Tachycardia Syndrome) as well as underlying essential hypertension," which "is very difficult to treat and can frequently lead to severe symptoms" that "can require her to miss work or have to leave early." J.A. 467–69. On May 22, 2018, Tidelands approved Sawyer's request and allotted her 432 hours of intermittent leave.

On May 20, 2018, Sawyer requested that she be placed "on call," J.A. 411, but was asked to come in because another nurse was sick. Sawyer informed the hospital that she was having a hypertensive crisis and declined to come into work. Based on that absence, Sawyer received a written corrective action on May 21, 2018.[1] Per Tidelands' policy, five unscheduled absences within a twelve-month period result in verbal counseling, and any additional unscheduled absences result in written corrective actions. Even though

---

[1] The corrective action states that Sawyer accrued the additional absence on May 21, but the record indicates, and the parties appear to agree, that the relevant absence occurred on May 20.

4

Sawyer's absences had previously "exceeded what this policy allows," Tidelands "follow[ed] the progressive nature of this policy by . . . issuing the first written" corrective action at that time.  J.A. 238.

Then, on August 10, 2018, Ranee Stephens—Sawyer's then-acting supervisor— issued Sawyer a second written corrective action which stated that since her May 21 corrective action, Sawyer accrued absences on "7/24/18 and 8/01/18" for which she "called and told the supervisor that [she] had nausea and vomiting related to taking medication." J.A. 240.[2]  The "7/24/2018" date is either crossed out or underlined, and "7/30/18" is written beneath it.  *Id.*  Sawyer's call-out notes indicate that the absences in question occurred on:  July 24, when Sawyer was absent due to an eye procedure; July 31, when Sawyer was absent due to nausea and vomiting related to new medication; and August 1, when Sawyer was absent due to heart/blood-pressure related symptoms.  It is handwritten on the form that Sawyer refused to sign it because she "state[d] she ha[d] FMLA for this." J.A. 241.  Sawyer later testified that the written corrective actions made her feel like she "didn't want to" utilize her FMLA leave and opined that "you really shouldn't make a person feel like they . . . can't, you know, stay home."  J.A. 435.[3]

---

[2] The corrective action form is dated "8/02/18" but signed by Stephens on August 10. We therefore assume that this corrective action was issued on August 10, 2018.  Relatedly, the record does not make clear which absences were the basis of this corrective action or when they occurred.  Because this does not bear on our analysis, we assume without deciding that the relevant absences occurred on July 24, July 31, and August 1, 2018.

[3] The parties omitted from the Joint Appendix the page of Sawyer's deposition transcript that preceded these statements.  It is therefore unclear from the record which actions made Sawyer feel dissuaded from taking FMLA leave.  However, consistent with the parties' briefing, we assume that she is discussing her written corrective actions.

Finally, on August 28, 2018, Stephens issued Sawyer a Class II corrective action for allegedly threatening another nurse, Meghan Brantley. The corrective action form asserts that the incident stemmed from Brantley reporting to Sawyer that a patient required transfer from 2 East (Brantley's ward) to 2 Parrish (Sawyer's ward): "In apparent response to the telephone report," Sawyer was "overheard stating loudly and angrily that [she was] going to 2 East and going to 'find that girl,'" and then "walk[ed] to the nurse's station on 2 East looking for Meghan where [Sawyer was] witnessed being loud, rude and threatening to 'beat her ass.'" J.A. 243.

According to Stephens, she learned about this event on August 9 from head nurse Mary Martinez, who heard from Brantley's "preceptor" that Sawyer had threatened to "beat [Brantley's] ass." J.A. 293; see J.A. 243. Brantley herself did not report the threat. Stephens then began investigating the incident and determined that it occurred on July 8, 2018, the only date on which Brantley and Sawyer both worked. Pursuant to her investigation, Stephens elicited written statements from Brantley, as well as employees Donna Brown and Candace Geddings, who also worked on July 8. Brantley stated that while she did not witness Sawyer's behavior firsthand, she heard from her team members that Sawyer "came over to [her] unit and was telling staff . . . how she was going to 'beat [Brantley's] a**.'" J.A. 245. Brown recounted that Sawyer came over to 2 East "in a rage" and asked where the "[n]ew girl" was. J.A. 246. And Geddings, who also worked on 2 East, stated that Sawyer "came over to [their] floor and was looking for [Brantley] to tell her how rude she was on the phone and stating that she would beat her a**." J.A. 244. Stephens also questioned Sawyer about the incident on August 10, but Sawyer declined to provide a written statement.

6

Per the August 28 corrective action form, this incident qualified as a Class II violation under the provision of the Tidelands Employee Corrective Action Policy prohibiting "[i]ntimidating, coercing, harassing, or interfering behavior with respect to co-workers, patient's guest and other customers." J.A. 243. Based on this violation, Tidelands terminated Sawyer's employment. The termination letter states that Sawyer was "discharged from employment, effective today, 8/28/18," because "Tidelands Health policy states that accumulation of two or more Class II written corrective actions at any time during employment results in discharge," and this was "the second class II written corrective action in [her] file," (her first arising from her failure to complete the Basic Life Support course in 2012). J.A. 679. The letter further stated that this was her "third written corrective action within 24 months," which also results in discharge pursuant to Tidelands' policy. *Id.*

Approximately two weeks after Sawyer's termination, Tidelands notified her that, per the WDP, it deducted $261.71 from her final paycheck to reduce the balance of an outstanding $974.05 hospital bill Sawyer owed. Tidelands had sent Sawyer prior notices of this outstanding balance in 2017, which Sawyer testified she did not recall receiving. The payroll coordinator explained that because Tidelands is "required by law to pay minimum wage on the regular hours you worked," "minimum wage is $7.25 per hour[]," and Sawyer "worked 5.8 hours," Tidelands left Sawyer "a minimum of $42.05." J.A. 48.

## II.

On June 4, 2019, Sawyer filed a complaint against Tidelands in federal district court, raising claims under the FMLA and SCPWA. The complaint alleges that Tidelands

7

interfered with Sawyer's right to take FMLA leave by issuing corrective actions against her for FMLA-covered absences and also retaliated against her for taking FMLA leave by terminating her. Additionally, Sawyer alleges on behalf of herself and all similarly situated employees that Tidelands' WDP violates the SCPWA by failing to provide proper notice of the deductions and unlawfully garnishing wages. The complaint states that the district court had supplemental jurisdiction over the SCPWA claim because it "arise[s] out of the same transaction or occurrence as the federal claims alleged herein." J.A. 8.

On November 9, 2020, Tidelands moved for summary judgment on both counts. A magistrate judge issued a report recommending that the district court grant Tidelands' motion. Addressing Sawyer's FMLA interference claim, the magistrate concluded that while Sawyer's absences for which she received the August 10 action were unrelated to her FMLA leave, there was a jury question as to whether Tidelands interfered with Sawyer's FMLA rights by disciplining her for the May 20 absence. However, the magistrate recommended dismissing Sawyer's FMLA interference claim after concluding that, because Sawyer's Class II corrective actions independently supported her discharge, there was no evidence Sawyer suffered any harm from the absence-related corrective actions. The magistrate also recommended rejecting Sawyer's FMLA retaliation claim on the ground that Sawyer's two Class II corrective actions provided a legitimate, non-pretextual reason for her termination. Finally, the magistrate recommended granting summary judgment for Tidelands on Sawyer's SCPWA claim because, by agreeing to the WDP, Sawyer received notice of the deduction as required by the statute, and because the deduction—which occurred without any legal or equitable action—did not constitute a garnishment.

8

Sawyer raised numerous objections to the magistrate's report, including, for the first time, a contention that the WDP is unconscionable. The district court adopted the magistrate's recommendations and concluded that the WDP's terms are not so oppressive as to be unconscionable. Accordingly, the court granted summary judgment for Tidelands and denied Sawyer's motion to certify the class as moot. This appeal followed.

III.

Before reaching the merits of Sawyer's appeal, we must exercise our "independent obligation to assess [our] subject-matter jurisdiction" over this case. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 480 (4th Cir. 2005). In its summary judgment decision, the district court did not discuss its basis for jurisdiction over Sawyer's claims, which sound in both federal and state law. While the district court's jurisdiction over Sawyer's federal FMLA claims is plain under 28 U.S.C. § 1331, we ordered supplemental briefing on whether the district court properly exercised supplemental jurisdiction over Sawyer's state law claim under the SCPWA.

Where district courts have original jurisdiction over a civil action, 28 U.S.C. § 1367 provides they "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). "[T]he test for determining whether state and federal claims form part of the same constitutional case or controversy is set forth in *United Mine Workers of America v. Gibbs*." *Axel Johnson, Inc. v. Carroll Carolina Oil Co.*, 145 F.3d 660, 662 (4th Cir. 1998). The

9

*Gibbs* test requires the state and federal claims to "derive from a common nucleus of operative fact," "such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

Sawyer's FMLA and SCPWA claims satisfy this test because they both "derive from a common nucleus of operative fact"—namely, Sawyer's employment with, and termination from, Tidelands. *Id.* That is, Sawyer alleges that Tidelands violated the FMLA by issuing her corrective actions for taking FMLA leave and ultimately terminating her in retaliation for exercising her FMLA rights. Pursuant to that termination, Tidelands deducted Sawyer's wages through its WDP, a condition of Sawyer's employment with Tidelands that Sawyer alleges violates the SCPWA. The arc, conditions, and ultimate termination of Sawyer's employment relationship with Tidelands thus form the foundation of Sawyer's FMLA and SCPWA claims alike, thereby placing Sawyer's SCPWA claim within the bounds of § 1367(a)'s grant of supplemental jurisdiction.

IV.

We review a district court's grant of summary judgment *de novo*. *Elderberry of Weber City, LLC v. Living Centers-Se., Inc.*, 794 F.3d 406, 411 (4th Cir. 2015). In doing so, we "us[e] the same standard applied by the district court," and "recogniz[e] that a court should grant summary judgment only if, taking the facts in the best light for the nonmoving party, no material facts are disputed and the moving party is entitled to judgment as a matter of law." *Brooks v. Johnson*, 924 F.3d 104, 111 (4th Cir. 2019) (citations omitted). "A genuine question of material fact exists where, after reviewing the record as a whole, a

10

court finds that a reasonable jury could return a verdict for the nonmoving party." *J.D. by Doherty v. Colonial Williamsburg Found.*, 925 F.3d 663, 669 (4th Cir. 2019).

## V.

Sawyer appeals the district court's summary judgment dismissal of her FMLA and SCPWA claims. Because we find no genuine dispute of material fact as to either cause of action, we affirm the district court's decision.

## A.

In her complaint, Sawyer alleges that Tidelands (1) interfered with her FMLA rights by disciplining her for taking FMLA leave and (2) terminated her in retaliation for exercising her FMLA rights. The district court granted summary judgment for Tidelands on the interference claim because it found that the written corrective actions for Sawyer's absences did not cause her harm, a necessary element of an FMLA interference claim. The district court also granted summary judgment for Tidelands on the retaliation claim because it concluded that Tidelands' decision to issue Sawyer two Class II corrective actions, which provided sufficient grounds for her termination, was not pretextual. We agree with the district court's reasoning on both scores.

## 1.

We first address Sawyer's FMLA interference claim. It is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1). We have explained that "[t]o make out an 'interference' claim under the FMLA, an employee must . . . demonstrate that

11

(1) he is entitled to an FMLA benefit; (2) his employer interfered with the provision of that benefit; and (3) that interference caused harm." *Adams v. Anne Arundel Cnty. Pub. Sch.*, 789 F.3d 422, 427 (4th Cir. 2015). Sawyer argues that Tidelands interfered with her FMLA leave when it issued her written corrective actions for her May, July, and August absences.

The district court concluded that Sawyer established questions of fact as to the first two elements of FMLA interference with respect to her May 20 absence, but that Sawyer's claim nevertheless failed at element three. The court explained that the written corrective actions did not harm Sawyer because she remained employed and was given full benefits until her termination, and her termination was independently based on her two Class II corrective actions. The court further rejected Sawyer's argument that "she suffered harm because the written corrective actions discouraged her from taking leave." J.A. 717.

On appeal, Sawyer advances the same arguments the district court rejected below: the written corrective actions for her absences harmed her because they resulted in her termination and, had she not received the corrective actions, she would have structured her leave differently.[4] Neither argument is availing.

To start, a reasonable jury could not find that Sawyer was terminated because of the written corrective actions concerning her absences. Sawyer's termination letter states:

---

[4] Because Sawyer's inability to satisfy the third element of the interference test is fatal to her claim, we need not address the first two elements. Therefore, we decline to consider Sawyer's additional arguments—including that Tidelands violated the FMLA by requiring her to assert that her leave was FMLA-related, by unilaterally determining that her eye procedure was not related to her FMLA, and by discouraging her from exercising her FMLA rights—which relate to the second element of the interference test.

> Today you received a class II written corrective action related to a violation of the Corrective Action Policy. This is the second class II written corrective action in your file . . . . Tidelands Health policy states that accumulation of two or more Class II written corrective actions at any time during employment results in discharge. Additionally, this is your third written corrective action within 24 months . . . . Tidelands Health Policy states that accumulation of any three written corrective actions within 24 months will result in discharge. Because of this, you are discharged from employment, effective today, 8/28/18, with Tidelands Health.

J.A. 247. Sawyer posits that the letter's reference to her three written corrective actions indicates that those actions were a factor in her termination. But the letter makes clear that while Sawyer's written corrective actions provided grounds for her discharge, there was a separate, independent basis for her termination: Sawyer's accrual of two Class II corrective actions. In other words, Tidelands "would have taken the contested adverse employment action"—here, terminating Sawyer— "regardless of [her] FMLA leave," which allows it to "avoid liability." *Roberts v. Gestamp W. Va., LLC*, 45 F.4th 726, 732–33 (4th Cir. 2022). This conclusion is bolstered by Sawyer's August 28 Class II corrective action form, which states that there was "no plan for improvement" because "this is the second class II in [Sawyer's] file," and "[a]ccumulation of two 'Level II' corrective actions . . . will result in discharge from employment with Tidelands Health." J.A. 243.

Nor could a reasonable jury find that Sawyer suffered harm on the ground that she would have structured her leave differently if she had not received the corrective actions. In alleging this harm, Sawyer relies on *Vannoy v. Federal Reserve Bank of Richmond*, where we held that prejudice from the violation of FMLA notice provisions could "be gleaned from evidence that had the plaintiff received the required (but omitted) information regarding his

FMLA rights, he would have structured his leave differently." 827 F.3d 296, 302 (4th Cir. 2016). Unfortunately for Sawyer, the record in this case lacks any such evidence.

In arguing otherwise, Sawyer points only to her deposition testimony that the written corrective actions made her feel like she "didn't want to" utilize her FMLA, and that "you really shouldn't make a person feel like they . . . can't, you know, stay home." J.A. 435. Viewing these statements in the light most favorable to Sawyer, they indicate, at best, that Sawyer felt generally discouraged from taking leave. But unlike the plaintiff in *Vannoy*, whose "unequivocal" testimony demonstrated that, "had he known of his right to reinstatement at the conclusion of leave, he would have taken the full 30-day leave of absence . . . to obtain the inpatient treatment he claims to have needed," *Vannoy*, 827 F.3d at 303, Sawyer's statements do not explain "what steps [she] would have taken had circumstances been different," *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 91 (2002). Absent more concrete evidence, Sawyer's assertion of harm fails.

2.

We next consider Sawyer's argument that Tidelands terminated her in retaliation for taking FMLA leave. The FMLA "prohibits employers from discriminating against an employee for exercising her FMLA rights." *Hannah P. v. Coats*, 916 F.3d 327, 347 (4th Cir. 2019). "We apply the *McDonnell Douglas* burden-shifting framework to FMLA-retaliation claims."[5] *Roberts*, 45 F.4th at 738. That framework first requires a plaintiff to

---

[5] In *Fry v. Rand Construction Corporation*, we noted that the Department of Labor has issued regulations indicating that claims for FMLA retaliation arise under § 2615(a)(1) which, in turn, suggests that such claims require only negative-factor causation. 964 F.3d (Continued)

establish a prima facie case of FMLA retaliation, which includes showing that there was a "causal link" between her protected activity and an adverse employment action. *Id.* If she succeeds, "'the burden shifts to the defendant to provide a legitimate, nonretaliatory reason for taking the employment action at issue.' And if the defendant so provides, the plaintiff may still prevail if they can show pretext." *Id.* (quoting *Hannah P.*, 916 F.3d at 347). "A plaintiff may satisfy this burden by showing either that the employer's explanation is not credible, or that the employer's decision was more likely the result of retaliation." *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 203 (4th Cir. 2016).

The parties do not dispute that Sawyer established a prima facie case of retaliation, or that Tidelands offered a legitimate, nonretaliatory explanation for Sawyer's termination (her two Class II corrective actions). Accordingly, our analysis hinges on whether that explanation was pretextual. Like the district court, we conclude that it was not.

Tidelands issued Sawyer two Class II corrective actions: one in 2012 for failing to complete the Basic Life Support course, and one in 2018 for allegedly threatening a coworker. Sawyer does not challenge the legitimacy of the first Class II corrective action but contends that the second was pretextual.[6] We disagree. Sawyer has not pointed to any

---

239, 245 (4th Cir. 2020). However, as in *Fry*, "[w]e need not resolve" the issue of the proper causation standard for FMLA retaliation claims because the parties appear to agree that the district court properly relied on the *McDonnell Douglas* framework below. *Id.* at 246.

[6] Sawyer also argues that, in rejecting her retaliation argument, the district court improperly made credibility findings as to Stephens. Even if this argument were meritorious, reviewing the district court's summary judgment decision de novo, we need not engage in credibility determinations to affirm its dismissal of Sawyer's FMLA retaliation claim.

15

evidence that Stephens was motivated by retaliatory animus, other than perhaps Stephens's issuance of the August 10 written corrective action for Sawyer's absences. And there is substantial evidence in the record, including the written statements by Geddings, Brown, and Brantley, that corroborate Tidelands' contention that Stephens issued the corrective action because Sawyer threatened Brantley.

Sawyer's efforts to undermine this evidence are unavailing. For example, Sawyer points to the time that elapsed between when she allegedly threatened Brantley on July 8 and the initiation of Stephens's investigation of the threat weeks later. Stephens testified, however, that she "began investigating [the incident] immediately" upon learning about it. J.A. 293. We are similarly unpersuaded by Sawyer's focus on Brantley's failure to report the threat to Stephens, Brown's failure to recount in her written statement that Sawyer explicitly threatened Brantley, and Stephens's discretion to issue a lesser sanction because "it is not our province to decide whether the [employer's reason for discharging the plaintiff] was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Laing v. Fed. Express Corp.*, 703 F.3d 713, 722 (4th Cir. 2013) (quoting *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000)). And here, the facts surrounding Sawyer's second Class II corrective action compel the conclusion that it was issued based on Sawyer's misconduct, not as a pretext for retaliation.

B.

Sawyer also contests the district court's summary judgment dismissal of her SCPWA claim. The purpose of the SCPWA is "to protect employees from the unjustified and wil[l]ful retention of wages by the employer." *Rice v. Multimedia, Inc.*, 456 S.E.2d

16

381, 383 (S.C. 1995). In Sawyer's view, Tidelands' WDP violates the SCPWA because it fails to provide notice of the time and place of the deduction, constitutes an unlawful garnishment in contravention of state and federal law, and is unconscionable. The district court rejected each of these arguments, and we similarly find them without merit.[7]

1.

Sawyer posits that the WDP fails to comply with the notice requirements set forth in § 41-10-30(A) and § 41-10-40(C) because it "does not provide employees with the required notice of the amount of the deductions or the time the deduction will be taken from employees' wages." Opening Br. 19 (emphases omitted). Section 41-10-40(C) provides:

> An employer shall not withhold or divert any portion of an employee's wages unless the employer is required or permitted to do so by state or federal law *or the employer has given written notification to the employee of the amount and terms of the deductions as required by subsection (A) of Section 41-10-30.*

S.C. Code Ann. § 41-10-40(C) (emphasis added). For its part, § 41-10-30(A) provides:

> Every employer shall notify each employee in writing at the time of hiring of the normal hours and wages agreed upon, the time and place of payment, *and the deductions which will be made from the wages*, including payments to insurance programs.

S.C. Code Ann. § 41-10-30(A) (emphasis added). Because an employee "does not have a private right of action for violation of section 41-10-30(A)," *Tarry v. Captain George's of S.C., LP*, No. 4:19-cv-00800-SAL, 2020 WL 12787708, at *3 (D.S.C. Sept. 21, 2020),

---

[7] Sawyer also contends the district court erred by failing to consider how the WDP violates S.C. Code Ann. § 41-10-50, which requires an employer to "pay all wages due to the employee within forty-eight hours of the time of separation or the next regular payday which may not exceed thirty days." However, because Sawyer does not make any specific argument as to how the WDP violates that section of the SCPWA, we do not separately address that provision herein.

§ 41-10-30(A) is relevant only to the extent that it is incorporated by § 41-10-40(C), *see*

*Barton v. House of Raeford Farms, Inc.*, 745 F.3d 95, 108 (4th Cir. 2014).

Sawyer argues that these provisions, taken together, require notice of the amount of the deduction and the time that the deduction will be taken. Tidelands, on the other hand, disputes that the SCPWA requires notice of the timing of the deduction. We need not decide this issue because even assuming Sawyer's reading is correct, we are satisfied that the WDP provides notice of both the amount *and* time of the deduction.

The WDP, which Sawyer admits she signed, states that "current or future debts and financial obligations owed by the employee to Georgetown Hospital System may be deducted from the employee's wages, including the final paycheck." J.A. 199. The WDP explains how it calculates the deductions: "Under applicable law, employers must pay employees minimum wage for each hour worked during a given period, but any earnings in excess of that amount may be deducted to cover debts or other financial obligations the employee has with respect to the employer." *Id.* The WDP also provides a list of examples of the financial obligations the hospital may deduct from employees' wages, which includes "[t]he cost of patient services rendered by Georgetown Hospital System to you or other family members for whom you are the guarantor that is not covered by another payment source such as medical insurance." *Id.*

Sawyer does not dispute that this language provides notice that Tidelands can "make[] deductions from their employees' final paycheck for any outstanding medical bills the employee, or a guarantor of the employee, owes to the medical network." Opening Br. 4. She contends, however, that this notice is insufficient because, at the time of hiring,

18

employees "have not incurred the debt that is the subject of the deduction" and likely do "not know when their last day of employment will be." *Id.* This proves too much. The WDP does not—because, at the time of hiring, it cannot—state the precise date employees will cease employment at Tidelands or the exact amount it will deduct from their final paychecks at that time. Instead, the WDP explains that it can deduct wages from employees' final paychecks, provides a list of the financial obligations for which deductions can be made, and spells out the hospital's method for determining how much money to deduct.[8] That language is sufficient to notify employees of the time and amount of wage deductions under the SCPWA.[9]

2.

Next, Sawyer argues that the WDP violates § 41-10-40(C) because it does not provide for deductions that are "required or permitted . . . by state or federal law." S.C. Code Ann. § 41-10-40(C). More specifically, Sawyer contends that Tidelands acts as a

---

[8] To the extent Sawyer argues that she did not receive notice of her outstanding medical bill, that fact is irrelevant to what she agreed at oral argument is her "facial challenge" to the WDP. Oral Argument at 16:38–52.

[9] Despite Sawyer's assertions otherwise, *Ross v. Ligand Pharmaceuticals, Inc.*, 639 S.E.2d 460 (S.C. Ct. App. 2006), and *Bennett v. Lambroukos*, 401 S.E.2d 428 (S.C. Ct. App. 1991), do not disturb this conclusion. In *Ross*, the court held that an employer failed to provide sufficient notice of the "time and place of payment" because it provided employees an estimated schedule for paying incentive compensation, from which it then arbitrarily departed. 639 S.E.2d at 463. Here, by contrast, the WDP accurately stated that it could deduct from a Tidelands employee's final paycheck. And *Bennett*, which held only that an employer violated § 41-10-30(A) by failing to notify an employee when she was hired that her paycheck would be subject to deductions, 401 S.E.2d at 430, is also inapposite. Unlike in *Bennett*, nobody disputes that the WDP provides notice that Tidelands employees' wages could be subject to deduction.

19

creditor rather than an employer when deducting employees' wages pursuant to the WDP, thereby violating state and federal laws proscribing or limiting garnishments. Sawyer cites two laws she believes the WDP contravenes: a federal law that places a ceiling on the amount of an individual's wages that can be garnished, 15 U.S.C. § 1673, and a South Carolina law that generally prohibits garnishments, S.C. Code Ann. § 37-5-104. The district court correctly rejected this argument by holding that the wage deduction in this case does not fall under either of the statutes' proscribed conduct.

Starting with the federal statute, the Consumer Credit Protection Act sets a maximum for the "aggregate disposable earnings of an individual" that can be subjected to garnishment. 15 U.S.C. § 1673(a). The statute defines a "garnishment" as "any legal or equitable procedure through which the earnings of any individual are required to be withheld for payment of any debt." 15 U.S.C. § 1672(c). Sawyer acknowledges that there was no legal or equitable procedure in this case but argues that the WDP is a *de facto* garnishment because it "has the same force and effect as garnishment." Opening Br. 25. This argument, however, is foreclosed by binding case law.

We considered an almost identical question in *Western v. Hodgson*, 494 F.2d 379 (4th Cir. 1974). In that case, employees purchased merchandise from a supermarket and executed agreements authorizing their employer to deduct amounts they owed to the supermarket "from their paychecks and to pay such amounts directly to" the supermarket. *Id.* at 379–80. The employees later alleged that the deductions were garnishments that exceeded the Consumer Credit Protection Act's cap. *Id.* at 380. The Court looked to the statute's language and concluded that it was "clear that by the term 'garnishment' Congress

20

contemplated some type of judicial transaction." *Id.* at 382. And because "[t]he purported wage assignments" in *Western* "were brought about by neither legal nor equitable procedure," we concluded "that these agreements are not 'garnishments' within the meaning of the Consumer Credit Protection Act" and dismissed the case. *Id.* at 382–83. That the WDP's deductions are executed without any type of judicial transaction dooms Sawyer's argument to the same fate.

For similar reasons, the WDP does not violate the South Carolina statute, which states: "With respect to a debt arising from a consumer credit sale, a consumer lease, a consumer loan, or a consumer rental-purchase agreement, regardless of where made, the creditor may not attach unpaid earnings of the debtor by garnishment or like proceedings." S.C. Code Ann. § 37-5-104. The WDP does not fall within the purview of this statute for two reasons. First, "[t]he purpose" of the South Carolina statute "is to clarify the law governing consumer credit and to protect consumer buyers against unfair practices by suppliers of consumer credit." *Fanning v. Fritz's Pontiac-Cadillac-Buick, Inc.*, 472 S.E.2d 242, 244 (S.C. 1996). Sawyer does not explain how the hospital acted as a supplier of consumer credit, or how her payment for medical services constitutes "a consumer credit sale, a consumer lease, a consumer loan, or a consumer rental-purchase agreement." S.C. Code Ann. § 37-5-104. And second, Sawyer's argument fails because the law only "applies to actions or other proceedings to enforce rights arising from" these consumer transactions, S.C. Code Ann. § 37-5-102, and no such proceedings are used to enforce the WDP.

21

3.

Finally, Sawyer argues that the WDP is unconscionable. She does not articulate how this argument is cognizable under the SCPWA, but assuming it is properly before us, we agree with the district court that it fails on the merits. "In South Carolina, unconscionability is defined as the absence of meaningful choice on the part of one party due to one-sided contract provisions," sometimes known as procedural unconscionability, "together with terms that are so oppressive that no reasonable person would make them and no fair and honest person would accept them," sometimes known as substantive unconscionability. *Simpson v. MSA of Myrtle Beach, Inc.*, 644 S.E.2d 663, 668 (S.C. 2007); *see also Damico v. Lennar Carolinas, LLC*, 879 S.E.2d 746, 754 (S.C. 2022).

Sawyer contends that Tidelands employees have no choice but to sign the WDP because it is a condition of employment. However, this argument only speaks to the procedural unconscionability of the contract. The South Carolina Supreme Court has explained that an adhesion contract is "not necessarily unconscionable, even though it may indicate one party lacked a meaningful choice," if the terms of the contract are not substantively unconscionable. *Damico*, 879 S.E.2d at 755. In other words, "to constitute unconscionability, the contract terms must be so oppressive that no reasonable person would make them and no fair and honest person would accept them." *Id.* While we might not agree with the terms of the WDP, they do not rise to that level of oppression. The WDP merely authorizes deductions of monies which employees legitimately owe and limits those deductions to ensure that employees are paid minimum wage. Moreover, employees are on notice of the WDP, and the possible financial obligations that could be deducted from

22

their wages, from the time of hiring.  From these facts, no reasonable jury could find that the terms of the WDP are unconscionable.

VI.

For the foregoing reasons, the district court's decision granting Tidelands summary judgment is

*AFFIRMED*.